[No. S048929. Aug. 3, 1998.]

In re MALCOLM J. ROBBINS on Habeas Corpus.

**COUNSEL**

Karen R. Smith, under appointment by the Supreme Court, and Richard H. Chapnik for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Susan Lee Frierson, Donald E. DeNicola and Marc J. Nolan, Deputy Attorneys General, for Respondent.

Kent S. Scheidegger and Charles L. Hobson as Amici Curiae on behalf of Respondent.

**OPINION**

**GEORGE, C. J.**—In California, as in other states and the federal system, in criminal proceedings it is *the trial* that is the main arena for determining the guilt or innocence of an accused defendant and, in a capital case, for determining whether or not the death penalty should appropriately be imposed on the defendant for the offense at issue. At trial, a defendant is afforded counsel and a panoply of procedural protections, including state-funded investigation expenses, in order to ensure that the trial proceedings provide a fair and full opportunity to assess the truth of the charges against the defendant and the appropriate punishment. Further, if a defendant is convicted at trial of a capital offense and is sentenced to death, California law provides for an automatic appeal of the judgment to this court, and for the appointment of competent counsel to represent the defendant on that appeal. It is *the appeal* that provides the basic and primary means for raising challenges to the fairness of the trial.

California law also recognizes that in some circumstances there may be matters that undermine the validity of a judgment or the legality of a defendant's confinement or sentence, but which are not apparent from the record on appeal, and that such circumstances may provide a basis for a collateral challenge to the judgment through a writ of habeas corpus. At the same time, however, our cases emphasize that habeas corpus is an extraordinary remedy that "was not created for the purpose of defeating or embarrassing justice, but to promote it" (*In re Alpine* (1928) 203 Cal. 731, 744

[265 P. 947, 58 A.L.R. 1500]), and that the availability of the writ properly must be tempered by the necessity of giving due consideration to the interest of the public in the orderly and reasonably prompt implementation of its laws and to the important public interest in the finality of judgments. For this reason, a variety of procedural rules have been recognized that govern the proper use of the writ of habeas corpus, including a requirement that claims raised in a habeas corpus petition must be timely filed.[1]

---

[1]Justice Brown's concurring and dissenting opinion in *In re Gallego* (1998) 18 Cal.4th 825, 830-853 [77 Cal.Rptr.2d 132, 959 P.2d 290] observes that our denial orders frequently address the merits "even when procedural bars may apply" and that because "the additional time necessary to discuss possible defaults and to formulate corresponding orders advances institutional goals marginally, if at all, [that practice] can usefully be eliminated from the process." (*Id.* at p. 852.) This statement is flawed in fundamental respects.

First, although our orders frequently address the merits when procedural bars apply, commonly they do not. Of the approximately 1,500 noncapital habeas corpus petitions disposed of annually by this court, a substantial proportion of our denial orders, representing hundreds of claims, typically rests solely on procedural grounds. In capital habeas corpus matters, although our orders frequently resolve claims both on procedural grounds and on the merits, we have on occasion denied claims solely on procedural grounds. (See, e.g., *In re Johnson* (S060758, den. Nov. 25, 1997); *In re Rich* (S054989, den. Jan. 16, 1997); *In re Horton* (S045771, den. July 18, 1996); *In re Proctor* (S043451, den. June 26, 1996).) In no event is merit review invariable or obligatory when a procedural bar applies.

Second, and most significantly, imposition of procedural bars substantially advances important institutional goals, which are overlooked by the concurring and dissenting opinion in *In re Gallego*. The concurring and dissenting opinion suggests that our bars exist merely as a means of promoting finality by insulating our judgments from federal court review. The basis and continuing import of our procedural bars are something quite different, however. Decades before development of the federal case law discussed in the concurring and dissenting opinion, we recognized and imposed procedural bars *as a means of protecting the integrity of our own appeal and habeas corpus process.* (See, e.g., *In re Miller* (1941) 17 Cal.2d 734, 735 [112 P.2d 10] [barring repetitive habeas corpus claims previously denied on the merits in a prior habeas corpus proceeding]; *In re Horowitz* (1949) 33 Cal.2d 534, 546-547 [203 P.2d 513] [barring habeas corpus claims that could have been raised in an earlier habeas corpus petition]; *In re Swain* (1949) 34 Cal.2d 300, 304 [209 P.2d 793] [barring habeas corpus claim when the petitioner failed to "fully disclose his reasons for delaying in the presentation of [facts asserted as a basis for relief]"]; *In re Dixon* (1953) 41 Cal.2d 756, 759 [264 P.2d 513] [barring habeas corpus claims that could have been raised on appeal]; *In re Waltreus* (1965) 62 Cal.2d 218, 225 [42 Cal.Rptr. 9, 397 P.2d 1001] [barring habeas corpus claims that were raised and rejected on appeal].) Imposition of these procedural bars, including the untimeliness bar, continues to advance, among other institutional goals, the integrity of our appeal and habeas corpus process. With specific regard to the bar of untimeliness in capital litigation, imposition of the bar has had the documented and salutary effect of promoting compliance with state habeas corpus procedures calling for prompt investigation and submission of habeas corpus claims. (See, e.g., Supreme Ct. Policies Regarding Cases Arising From Judgments of Death, policy 3, Standards governing filing of habeas corpus petitions and compensation of counsel in relation to such petitions, pt. 1, Timeliness standards.) Clearly, that institutional interest would suffer were the timeliness requirement to be ignored, as urged by the concurring and dissenting opinion.

We issued an order to show cause in this matter and in the companion case of *In re Gallego, supra,* 18 Cal.4th 825 (*Gallego*), not to consider the merits of the claims raised in the respective habeas corpus petitions, but instead to address a number of general procedural issues relating to petitions for writs of habeas corpus in capital cases, and, in particular, to address the question of the timeliness of claims advanced in such petitions. Under the applicable policies and case law governing the filing of habeas corpus petitions in capital cases in a California court, whenever a habeas corpus petition is filed more than 90 days after the filing of the reply brief in the direct appeal, the petitioner has the burden of establishing the timeliness of the claims raised in the petition. In both this case and in *Gallego*, the habeas corpus petitions were filed after the 90-day "presumptively timely" date, and respondent, in its informal response to each of the petitions (see Cal. Rules of Court, rule 60), asserted that a variety of claims raised in each of the petitions should be denied as untimely. We issued an order to show cause in these two cases to analyze the timeliness issue and to explain, in the context of specific claims, how the timeliness rules are applied by our court.

The petitioner in the present proceeding is Malcolm J. Robbins. Petitioner's judgment of conviction and sentence of death was affirmed on appeal in 1988. (*People* v. *Robbins* (1988) 45 Cal.3d 867 [248 Cal.Rptr. 172, 755 P.2d 355], cert. den. (1989) 488 U.S. 1034 [109 S.Ct. 849, 102 L.Ed.2d 981] (*Robbins I*).) In September 1995, petitioner filed the present petition for a writ of habeas corpus, his second habeas corpus petition filed in a state court. The petition raised 40 separately designated claims. Our order to show cause directed respondent (the Director of Corrections, represented by the Attorney General) to show cause why this court should not find various subclaims advanced in one of the petition's 40 claims (Claim I) to be timely, either because (i) the subclaims were presented "without substantial delay," (ii) "good cause" exists for any substantial delay, or (iii) one of the exceptions to the bar of untimeliness applies.

For the reasons set out below, we conclude, on the timeliness issue in question, that petitioner has established that three subclaims of Claim I are not substantially delayed, but has failed to sustain his burden of establishing absence of substantial delay, good cause for such delay, or that an exception to the bar of untimeliness applies, with regard to the remaining subclaim of Claim I. Furthermore, although we issued our order to show cause in order to address the timeliness issue only, we also conclude, as we shall explain, that all of the claims raised in the petition must be rejected on the merits, and that most claims also must be rejected on various procedural grounds. Accordingly, we shall, in an accompanying order, a copy of which is appended to this opinion, deny the petition for a writ of habeas corpus in its entirety.

We set out immediately below, and describe in greater detail in the body of the opinion, the basic analytical framework governing our timeliness determination.

■ Pursuant to policies adopted by this court in June 1989, a habeas corpus petition is not entitled to a presumption of timeliness if it is filed more than 90 days after the final due date for the filing of appellant's reply brief on the direct appeal. In such a case, to avoid the bar of untimeliness with respect to each claim, the *petitioner* has the burden of establishing (i) absence of substantial delay, (ii) good cause for the delay, or (iii) that the claim falls within an exception to the bar of untimeliness.

■ Substantial delay is measured from the time the petitioner or his or her counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim. A petitioner must allege, *with specificity,* facts showing when information offered in support of the claim was obtained, and that the information neither was known, nor reasonably should have been known, at any earlier time. It is not sufficient simply to allege in general terms that the claim recently was discovered, to assert that second or successive postconviction counsel could not reasonably have discovered the information earlier, or to produce a declaration from present or former counsel to that general effect. A petitioner bears the burden of *establishing*, through his or her specific allegations, which may be supported by any relevant exhibits, the absence of substantial delay.

■ A claim or a part thereof that is substantially delayed nevertheless will be considered on the merits if the petitioner can demonstrate good cause for the delay. Good cause for substantial delay may be established if, for example, the petitioner can demonstrate that because he or she was conducting an *ongoing investigation* into at least one potentially meritorious claim, the petitioner delayed presentation of one or more other known claims in order to avoid the piecemeal presentation of claims, but good cause is *not* established by prior counsel's asserted uncertainty about his or her duty to conduct a habeas corpus investigation and to file an appropriate habeas corpus petition.

■ A claim that is substantially delayed without good cause, and hence is untimely, nevertheless will be entertained on the merits if the petitioner demonstrates (i) that error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner; (ii) that the petitioner is actually innocent of the crime or crimes of which he or she was convicted; (iii) that

the death penalty was imposed by a sentencing authority that had such a grossly misleading profile of the petitioner before it that, absent the trial error or omission, no reasonable judge or jury would have imposed a sentence of death; or (iv) that the petitioner was convicted or sentenced under an invalid statute. When we apply the first three of these exceptions, we shall do so exclusively by reference to state law. When we apply the fourth exception, we apply federal law in resolving any federal constitutional claim.

█ We also shall clarify the scope of counsel's duty to conduct a habeas corpus investigation. An attorney whose appointment includes responsibility for habeas corpus representation has had, since June 1989, a duty to investigate factual and legal grounds for the filing of a petition for a writ of habeas corpus. This duty requires that counsel (i) conduct a follow-up investigation concerning specific triggering facts that come to counsel's attention in the course of, among other things, reviewing the reporter's and clerk's transcripts, reviewing trial counsel's existing files, preparing or reviewing the appellate briefs, and interviewing the client or trial counsel, and (ii) timely present to this court any resulting potentially meritorious habeas corpus claims. Counsel is not expected to conduct an unfocused investigation grounded on mere speculation or hunch, without any basis in triggering fact.

I

The facts are stated in our opinion on the appeal. (*Robbins I, supra,* 45 Cal.3d at pp. 872-878.) We recount directly below in brief outline, and in greater detail in the body of this opinion, the facts and corresponding procedural history necessary to address the procedural issues set forth in our order to show cause.

A

In June 1980, six-year-old Christopher Finney disappeared on the way home from his father's store in Isla Vista. His skeleton was found three months later. A medical examiner concluded that death was caused by a broken neck. Petitioner was arrested in New Jersey in November 1980 on an unrelated matter. While in custody there, he confessed to police officers that he had sodomized, strangled, and killed a young boy in California, later determined to be Christopher.

At petitioner's trial for Christopher's murder, the prosecution introduced evidence that, while in New Jersey, petitioner had confessed his California

crime to Officer Truly M. Holmes of the Dallas, Texas, Police Department, and that petitioner had told Holmes that he had committed a similar sex-related killing of a young boy, Steven Little, in Dallas. Evidence of this Dallas offense—which is the focus of Claim I—was important to the prosecution's case: It was one of the points relied upon by the prosecution (in addition to the above described confession) to establish petitioner's intent to engage in lewd and lascivious conduct with Christopher (which in turn was necessary to establish the death-qualifying special circumstances in this case), and it helped establish the first degree murder elements of premeditation and deliberation. (*Robbins I, supra*, 45 Cal.3d at p. 878.)[2]

Little's body had been found in a burning dumpster shortly after 2:00 a.m. on December 28, 1979. In response to this evidence, trial counsel for petitioner sought to demonstrate that petitioner's confession to the Dallas crime was untrue because: (1) petitioner was psychologically prone to confess falsely to unsolved crimes, and (2) petitioner was seen in Palm Springs early on December 26, 1979, kept a doctor's appointment in Palm Springs at between 4:00-5:00 p.m. on December 28, and hence could not have committed the Dallas crime.[3]

On the issue whether petitioner was prone to confess falsely, the prosecution elicited testimony from Dallas Police Officer Holmes to the effect that petitioner's confession revealed several details of the Little killing "that could have been known only to those who investigated [that] murder." In addition, the prosecution offered, and the trial court eventually allowed, further rebuttal testimony from three out-of-state police witnesses who explained that petitioner had declined to confess to similar crimes in their states.[4] During the course of hearing and argument on the propriety of this additional rebuttal testimony, the prosecution told the court and counsel for petitioner that it previously had been unaware of the "failure to confess" rebuttal information.

In response to petitioner's evidence concerning the issue of the Dallas crime's time frame, the prosecution presented testimony designed to demonstrate that the Dallas killing could have occurred as early as 11:00 p.m. on

[2]The defense theory was that although petitioner had killed Christopher, there had been no sexual activity nor any sexual motive for the killing, and the killing was neither deliberate nor intentional.

[3]The persuasiveness of this latter argument was undermined by the testimony of a defense witness who conceded that he told police officers investigating the California killing of Christopher Finney that petitioner had told him that he (petitioner) had taken a short trip to Dallas, Texas, at the end of December 1979, and that in order to return to California he had "driven all through the night and the day." (See also *Robbins I, supra*, 45 Cal.3d at p. 873.)

[4]It was established definitively that petitioner could not have been the culprit as to one of the out-of-state cases in which petitioner denied responsibility. The prosecution argued that on this record, one could conclude that petitioner confessed only to those crimes of which he was guilty. (*Robbins I, supra*, 45 Cal.3d at p. 874.)

December 27, 1979. John Fitzgerald, a private citizen, related that he and a friend had seen smoke rising from the area of the burning dumpster shortly after 1:00 a.m. on December 28, 1979. Captain Jerry Foster, a Dallas firefighter, testified that the dumpster fire could have started several hours before Fitzgerald saw smoke—i.e., as early as 11:00 p.m. on December 27. Dallas Police Officer J. W. Johnson testified on the basis of his own experience that it was possible to drive from Dallas to Palm Springs in 18 hours. We noted in our opinion on the appeal that petitioner's "alibi evidence made it questionable but not impossible that [petitioner] was in Dallas at the critical times." (*Robbins I, supra,* 45 Cal.3d at p. 873.)

## B

After affirming the judgment on appeal in 1988, in September 1989 we denied on the merits a July 1989 habeas corpus petition filed by former counsel, the State Public Defender, raising six claims. (S011321.) In September 1991, petitioner proceeded to federal court, which immediately appointed new counsel, who in August 1994 filed a federal habeas corpus petition. In March 1995, the federal court ordered petitioner to exhaust his state court remedies. Thereafter we allowed the State Public Defender to withdraw, and appointed federal habeas corpus counsel to represent petitioner in this court. ██ ██ New counsel subsequently filed, on September 18, 1995, the present state habeas corpus "exhaustion" petition.[5]

As noted above, our order to show cause is limited to the timeliness of Claim I. In four subclaims within Claim I, petitioner contends that misrepresentation, perjury, and the suppression of evidence all undermine the prosecution's proof at trial of both (1) the veracity of petitioner's confession to the Dallas killing, and (2) petitioner's ability to have been in Dallas at the time of that killing.[6]

---

[5]Respondent observes that the petition is not verified *by petitioner,* but instead by his counsel, and asserts it should be dismissed for that reason. Penal Code section 1474 provides in subdivision 3 that a petition for writ of habeas corpus "must be verified by the oath or affirmation of the party making the application," but it also states in its opening sentence that a petition may be "signed either by the party for whose relief it is intended, *or by some person in his behalf.*" (Italics added.) Because counsel may apply for habeas corpus relief on behalf of his or her client, it follows that when appointed counsel does so, verification by counsel satisfies the statute. (See *In re Davis* (1979) 25 Cal.3d 384, 389 [158 Cal.Rptr. 384, 599 P.2d 690].)

[6]Respondent reads Claim I as stating a fifth subclaim, concerning alleged perjury by prosecution witness Johnson of the Dallas Police Department. As mentioned above, Johnson testified that he and another officer once drove on official business from Dallas to Indio, California, in 18 hours, and he expressed his opinion that one could similarly drive from Dallas to Palm Springs in 18 hours. Trial counsel for petitioner learned shortly after trial that

## II

### A

The petition is not entitled to a presumption of timeliness because it was not filed "within 90 days after the final due date for the filing of appellant's reply brief on the direct appeal." (Supreme Ct. Policies Regarding Cases. Arising From Judgments of Death, policy 3, Standards governing filing of habeas corpus petitions and compensation of counsel in relation to such petitions (Policy 3), pt. 1, Timeliness standards, std. 1-1.1, originally adopted eff. June 6, 1989.) Accordingly, in order to avoid the bar of untimeliness, *petitioner* has the burden of establishing either (i) "absence of substantial delay" (*id.*, std. 1-1.2; see *In re Clark* (1993) 5 Cal.4th 750, 782-784 [21 Cal.Rptr.2d 509, 855 P.2d 729] (*Clark*)), (ii) "good cause for the delay" (Policy 3, *supra*, std. 1-2; *Clark, supra,* 5 Cal.4th at pp. 783-787), or (iii) that his claims fall within an exception to the bar of untimeliness (*Clark, supra,* 5 Cal.4th at pp. 797-798).

### B

We proceed to address whether each of the four subclaims of Claim I is substantially delayed, and if so, whether there is good cause for that delay, and further, if the subclaim is untimely, whether it falls within any exception to the bar of untimeliness.

---

the Dallas police had no record of Johnson's having made such a trip on official business. Petitioner states in his traverse that the assertion of perjury by Johnson "has not been alleged . . . as a claim or a subclaim" and that the asserted perjury by Johnson, standing alone, does not "provide[] a sufficient legal basis for granting habeas [corpus] relief" to petitioner. Accordingly, we do not treat the allegations concerning Johnson as a subclaim of Claim I.

Contrary to the assertion in Justice Kennard's concurring and dissenting opinion, petitioner's traverse does not take issue with respondent's characterization of Claim I as embodying four other separate subclaims, each of which involves analytically distinct facts and each of which petitioner expressly or implicitly claims entitles him to relief. (Indeed, petitioner's traverse *repeatedly adopts* respondent's characterization of Claim I as comprising separate subclaims. It asserts, among other things, that petitioner had "No Notice of the Availability of Sub-claim[s] Advanced in Claim I," and that he has "Timely Filed the Sub-claims Advanced in Claim I," "Justified Any Substantial Delay in Filing of the Sub-claims Advanced in Claim I," and that "all or part" of Claim I falls within an exception to the bar of untimeliness.) It is clear that a petitioner may not circumvent generally applicable timeliness requirements merely by aggregating analytically separate claims under the umbrella of a single designated claim, and petitioner advances no such argument. Thus, although we refer to separate subclaims of Claim I, for analytical purposes each such subclaim could just as appropriately be characterized as a separate claim.

### 1. *Claim that prosecutor lied about discovery*
### *(Claim I, paragraphs 20-22—the Garton subclaim)*

As noted above, in 1980-1981, when petitioner was being held by police officers in New Jersey, officers from numerous other jurisdictions questioned him about various unsolved crimes in their jurisdictions. The prosecution at petitioner's California trial sought to introduce evidence of some of those interviews in its case on rebuttal, and assured petitioner and the trial court that it previously had been unaware of such rebuttal evidence. Petitioner asserts that in so stating, the prosecution lied. We describe below the information offered in support of petitioner's contention.

Prior to petitioner's California trial, his trial counsel, Jake Stoddard, requested discovery of statements made by petitioner, including those made to out-of-state police agencies. Counsel also requested discovery of the New Jersey jail's "sign in or identification lists" showing the names of officers who had interviewed petitioner. (*Robbins I, supra*, 45 Cal.3d at p. 883.)

At trial, the defense attempted to dispel the effect of the evidence that petitioner had confessed to the 1979 killing of Steven Little in Dallas, Texas, by eliciting the testimony of a psychologist that petitioner was predisposed to confess falsely. On cross-examination of the psychologist, the prosecution elicited the concession that on occasion petitioner had declined to confess to the police, and the prosecution thereafter sought to present, on rebuttal, police officers from three states to testify that when interviewed in New Jersey petitioner had declined to confess to unsolved sex crimes in their states involving young boys.

During extensive arguments and hearings that followed, defense counsel asserted that he had not received discovery of the "failure to confess" evidence or other statements made by petitioner to out-of-state police agencies. The prosecutor asserted that prior to trial he had given to defense counsel all statements he had possessed, and that he had discovered only *after* presentation of petitioner's trial evidence (in which petitioner asserted that he was prone to confess falsely), the failure to confess interviews that the prosecutor proposed to present on rebuttal. The prosecutor also asserted that he had been unable to produce jail sign-in or identification lists showing the names of officers who had interviewed petitioner in New Jersey, but that he had recently determined—again, after investigating the evidence presented by petitioner at trial—that New Jersey Detective Robert Garton had kept business cards of the various police officers who had interviewed petitioner in New Jersey. The prosecutor maintained that he had disclosed the recently discovered interview reports and business cards to the defense

immediately after obtaining them shortly after presentation of the defense evidence. The trial court found no bad faith on the prosecutor's part in complying with the discovery order, and allowed admission of the rebuttal evidence. The court ordered a one-day continuance and directed the prosecutor to provide to the defense the original police reports concerning the rebuttal witnesses' interviews with petitioner. (See *Robbins I, supra,* 45 Cal.3d at pp. 883-884.)[7]

In support of his contention in the present habeas corpus petition that the prosecutor lied to the defense and the court about the availability, prior to trial or presentation of the defense evidence, of statements that petitioner had made to out-of-state police officers, petitioner provides a July 1995 declaration by former New Jersey Detective Garton. In his declaration Garton states: "I . . . went out to Santa Barbara, California, on two occasions to testify. At the time of my first trip to Santa Barbara to testify, I hand carried a complete copy of the Cumberland County file on [petitioner] which included all of my reports, copies of the drawings made by [petitioner], . . . the reports from all the other jurisdictions that conducted interviews of [petitioner], and all other materials relevant to the prosecution of [petitioner]. *I personally delivered this file which was in a brown accordion type folder with a flap to the District Attorney.* The file had been set up so that there were subdivisions within it on other locations [i.e., jurisdictions] with

---

[7]On appeal, we found that "[a]ssuming the trial court erred in concluding the prosecution adequately complied with the discovery order, reversal is not warranted here. First, the usual remedy for noncompliance with a discovery order is not suppression of evidence, but a continuance. [Citation.] Second, *assuming* the 24-hour continuance was inadequate to dispel any prejudice resulting from the prosecution's conduct, any error was harmless.

"Contrary to defense counsel's representations that he might have prepared a different defense had he been aware of behavior inconsistent with the assumed pattern of false confessions, we strongly doubt he would have done so. Once the confession to the present crime and the confession to the Dallas crime were ruled admissible, the defense had very little choice about what strategy to pursue. An effort to show that defendant tends to confess falsely—based on the alibi evidence for the Dallas offense—must have been his best hope. The alibi evidence, if successful, would have drawn the sting from the Dallas offense as 'other crimes' evidence.

"Most significantly, the evidence of defendant's guilt was very strong. He confessed in detail to the charged crime. Though the defense presented psychiatric evidence that he might have made some false statements in that confession, he did admit killing the boy, and counsel explicitly conceded the killing in his argument. Moreover, although counsel contested the sexual aspects of the encounter with Christopher, the testimony of his own expert witnesses undermined this position more effectively than any rebuttal evidence. Each expert offered pedophilia as a diagnosis of defendant's psychological state. Each witness thought it at least likely that defendant had a sexual motive in picking up Christopher. We conclude the evidence that Christopher's killing occurred in the course of a [Penal Code] section 288 violation was extremely strong, and that it is not reasonably likely the rebuttal testimony cost defendant a more favorable result." (*Robbins I, supra,* 45 Cal.3d at pp. 884-885, italics in original.)

the papers on those other locations [i.e., jurisdictions] being placed in a [manila] file labeled with that location."[8] (Italics added.)

Petitioner maintains that had the trial court found noncompliance with the discovery order and departed from the usual remedy of a continuance in favor of exclusion of the rebuttal evidence, a trial outcome more favorable to petitioner would have resulted. Petitioner also asserts that, had the prosecutor disclosed the out-of-state reports *prior to trial* as required by the discovery order, the defense would have (i) been able to impeach the three officers' "failure to confess" rebuttal evidence by reference to the officers' own contemporaneous reports, and (ii) been better able to defend against petitioner's confessions to the California and Texas homicides by showing that he had made them under circumstances undermining their reliability.

### a. *Substantial delay*

*Petitioner* has the burden of establishing the absence of "substantial delay." Substantial delay is measured from the time the petitioner or counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim. If a petitioner fails to allege particulars from which we may determine when the petitioner or counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim, he or she has failed to carry the petitioner's burden of establishing that the claim was filed without substantial delay.

A petitioner does not meet his or her burden simply by alleging in general terms that the claim or subclaim recently was discovered, or by producing a declaration from present or former counsel to that general effect. He or she must allege, *with specificity,* facts showing when information offered in support of the claim was obtained, and that the information neither was known, nor reasonably should have been known, at any earlier time—and he or she bears the burden of *establishing,* through those specific allegations (which may be supported by relevant exhibits; see *post,* fn. 16), absence of substantial delay. (Policy 3, *supra,* std. 1-1.2 ["A petition . . . may establish absence of substantial delay if it alleges with specificity facts showing the petition was filed within a reasonable time after petitioner or counsel (a)

---

[8]Although petitioner does not allege when this "first trip to Santa Barbara to testify" occurred, respondent's return characterizes petitioner's subclaim as alleging "that, prior to trial, the Santa Barbara prosecutor in fact had received *all* police reports about petitioner's statements to other police agencies in New Jersey" (italics in original), and respondent does not dispute that Garton's "first trip" occurred either prior to trial, or prior to presentation of the defense evidence.

knew, or should have known, of facts supporting a claim, *and* (b) became aware, or should have become aware, of the legal basis for the claim." (Italics in original.)].)

■■■■ We turn to an examination of whether petitioner has met his burden with regard to the Garton subclaim of Claim I.[9]

 (i) *When was the information offered in support of the Garton subclaim of Claim I obtained, and was it known, or should it reasonably have been known, by petitioner at any earlier time?*

■ Petitioner asserts *generally* that he "became aware of the factual and legal basis" for Claim I (including, apparently, the Garton subclaim) "within the last ninety days" before September 17, 1995—i.e., no earlier than mid-June 1995.

As noted *ante*, at pages 787-788, petitioner must do more than simply allege in general terms that the claim or subclaim recently was discovered, or produce a declaration from present or former counsel to that general effect. Clearly, the foregoing general allegation does not satisfy petitioner's obligation to allege, with specificity, facts showing when the information offered in support of the claim was obtained and that the information offered in support of the claim was neither known, nor reasonably should have been known, at any earlier time.[10]

---

[9]We have stated that claims presented in a "subsequent" petition that *should have been* presented in an earlier filed petition will be barred as "successive" unless the petitioner "adequately explains" his or her failure to present *all* claims in the earlier filed petition. (See *In re Horowitz, supra,* 33 Cal.2d 534, 546-547; *Clark, supra,* 5 Cal.4th at pp. 768, 782.) Although *Clark, supra,* 5 Cal.4th 750, reaffirmed our prior case law imposing on a petitioner the duty to explain why a claim was not presented in a prior petition, we also observed in *Clark,* that we had not strictly or regularly adhered to such requirements in the past. (*Clark, supra,* 5 Cal.4th at p. 768.) For that reason, in *Clark* (see 5 Cal.4th at p. 782) we did not rely on the bar of *In re Horowitz* "successiveness," and instead rested our denial of the petition exclusively on the bar of untimeliness. Because the prior habeas corpus petition in this matter was filed before the date of finality of *Clark,* we again here do not rely upon our successiveness rule. *Clark* serves to notify habeas corpus litigants that we shall apply the successiveness rule when we are faced with a petitioner whose prior petition was filed after the date of finality of *Clark.*

[10]The requirement that a petitioner allege, *with specificity,* facts establishing the timeliness of a claim is not a new requirement imposed for the first time in this opinion. On the contrary, as we have noted, Policy 3 has, since its adoption in 1989, articulated the requirement that a petitioner allege, *with specificity,* facts showing the timeliness of each claim, and demonstrate good cause for any substantial delay in the filing of a claim. Although we granted review in this case to clarify our application of the timeliness requirement, the basic requirement that we apply here—evaluating the petition to determine whether petitioner has alleged, *with specificity,* facts showing the timeliness of each analytically distinct claim

Nor do we find sufficient petitioner's general assertion that, because his petition was filed just more than two years after we issued *Clark, supra,* 5 Cal.4th 750, in July 1993, neither the Garton subclaim of Claim I, nor any other subclaim or claim in his petition, is substantially delayed. As noted above, delay is measured from the time—after the announcement of Policy 3 in June 1989—when petitioner or counsel knew, or should have known, of the information offered in support of the claim. (*Clark, supra,* 5 Cal.4th at p. 785 [measuring delay from effective date of Policy 3].) Accordingly, even if petitioner had submitted all of his claims promptly after the filing of *Clark,* this would not by itself satisfy petitioner's burden of establishing that the Garton subclaim of Claim I, or any other claim presented herein, was filed without substantial delay.

Normally, such inadequate allegations in a petition would lead to a conclusion that the petitioner has failed to meet his or her burden of establishing absence of substantial delay. Because we issued an order to show cause on procedural timeliness issues, however, in this matter we shall consider pertinent supplemental allegations in petitioner's traverse. As explained below, specific allegations in the traverse, which petitioner has supported by specific declarations appended to the petition, satisfy petitioner's burden with regard to the Garton subclaim of Claim I.

Petitioner asserts in his traverse that he "became aware of those material facts alleged in" the Garton declaration only "at or about the time" that the declaration was "in fact obtained" from former Detective Garton "in . . . New Jersey" in July 1995. In support of this specific allegation, petitioner cites a declaration (appended to the petition) of Attorney Richard Chapnik, who has assisted petitioner's appointed counsel in this matter.

Chapnik asserts that in January 1993 he commenced investigating the circumstances of petitioner's custody in New Jersey. He explains that he traveled to New Jersey, attempted to obtain access to records concerning petitioner, but met with little success. Thereafter, Chapnik declares, in September 1994 he contacted the Santa Barbara District Attorney (Thomas Sneddon) who prosecuted petitioner for the California murder of Christopher Finney, and asked for "supervised access" to the office's files, in order to "obtain records pertaining to petitioner at the relevant times." Chapnik explains that when this request was denied, petitioner filed, in January 1995,

(whether characterized as a claim or subclaim, and whether the allegations pertain to substantial delay or good cause for delay)—is by no means a new requirement. Accordingly, there is no unfairness in applying this requirement to petitioner, and our ruling here provides no reason or justification for reopening prior orders of this court that have barred a claim as untimely.

an ex parte sealed request for permission to inspect and copy records "maintained on petitioner" by various governmental entities of Santa Barbara County. After the superior court denied the request without prejudice to renewal in a noticed motion, petitioner then obtained from the federal district court an order permitting him to inspect and copy those records. Chapnik declares: "A search of . . . the District Attorney's file on Petitioner in April and May of 1995 revealed heretofore unknown and suppressed facts concerning the evidence introduced" by the state at petitioner's trial. Chapnik explains that a "lead" was found in the files, "referencing the fact that . . . prosecution witness, Det. Robert Garton of the Millville, New Jersey Police Department, was 'bringing everything' with him regarding the New Jersey file on Petitioner when he first arrived in Santa Barbara to testify for the prosecution."

Chapnik's declaration further asserts that petitioner's investigator was sent to New Jersey to interview former Detective Garton. "During that interview with former Det. Garton in New Jersey, counsel's investigator discovered that all records relating to all interrogations conducted by out-of-state law enforcement agents had been personally delivered by Det. Garton to the Santa Barbara prosecutor, Thomas Sneddon, at the time that Det. Garton first arrived in Santa Barbara to testify at petitioner's trial. . . ."

Petitioner's trial counsel, Jake Stoddard, asserts in his declaration (also appended to and cited by the petition): "Despite my ongoing demand for disclosure of any reports and documents in the actual possession and control of the Santa Barbara District Attorney's Office or obtainable by them about which agencies had interrogated my client, . . . Thomas Sneddon failed to provide information about all law enforcement representatives who had interviewed [petitioner] while he was in custody in New Jersey in 1980-1981." The declaration continues: "Because the prosecutor's office affirmatively told me that no sign-in sheets or other records of law enforcement contacts with petitioner in New Jersey existed or could be recreated, I prepared my defense expert witnesses with the only information I received through discovery regarding my client's alleged prior statements. I believed I was in possession of all available statements made by my client to police officers while in custody in New Jersey and that I could rely on the limited universe of statements disclosed through discovery. [¶] I recently was shown by habeas [corpus] counsel . . . a photocopy of various law enforcement agencies' business cards kept by former New Jersey Detective Robert Garton. Included in this group is a business card from Roger Zeihen, a police officer from Wisconsin who testified in the prosecution's rebuttal case. I did not know of the existence of this witness until he testified in the rebuttal case. . . . . I wanted all contacts with my client, and if I had

been made aware of these records at the time, I would have contacted these agencies, and would have provided that information to my experts. . . ."

By the above, petitioner has established that "triggering facts" justifying an investigation into the Garton subclaim of Claim I first were discovered when petitioner succeeded in gaining access to the Santa Barbara District Attorney's files in April or May 1995, that the information offered in support of the Garton subclaim was obtained when petitioner's investigator traveled to New Jersey and secured the Garton declaration in July 1995, and that the information was not known, nor should it reasonably have been known, until then.

Respondent asserts, nevertheless, that petitioner "should have" learned earlier of the information offered in support of the Garton subclaim. As explained below, most of respondent's arguments are premised on an erroneous understanding of our habeas corpus procedural rules and the scope of counsel's duty to conduct a habeas corpus investigation in a capital case.

Respondent first observes that petitioner asserts at one point that "[t]he prosecution's explanation [about when the prosecutor had become aware of the impeachment information offered by the three out-of-state rebuttal witnesses] *was belied by its own questioning*" of the witnesses at trial. (Italics added.) Based upon this, respondent contends, "current counsel apparently believe[] that the prosecutor's alleged lies about discovery were apparent from the face of the trial transcript." Moreover, respondent observes, when Detective Garton testified for the prosecution in the penalty phase following the discovery arguments, "[d]efense counsel obviously felt motivated to inquire into the veracity of the prosecutor's representations about the availability of the evidence of petitioner's statements, for he in fact questioned Garton closely about the prosecutor's efforts to reconstruct the jail 'lists' and Garton's later furnishing of the information from the various policemen's business cards." Respondent concludes, based upon petitioner's characterization of the trial transcript and defense counsel's cross-examination of Garton, that petitioner has since 1983 possessed "triggering facts" supporting an investigation into the claim that the prosecution lied about discovery, and that petitioner should have known of that claim since that time.

Petitioner's former counsel, whose appointment by this court included responsibility for both the direct appeal *and* habeas corpus representation,

had, since adoption of Policy 3 in June 1989,[11] a "duty to investigate factual and legal grounds for the filing of a petition for a writ of habeas corpus." (Policy 3, *supra*; std. 1-1.) This duty required that counsel (i) conduct a follow-up investigation concerning specific triggering facts that came to counsel's attention in the course of preparing the appeal[12] (e.g., in the course of reviewing the reporter's and clerk's transcripts and trial counsel's existing files, preparing the briefs, and interviewing the client or trial counsel),[13] and (ii) timely present to this court any resulting potentially meritorious habeas corpus claims. (See *Gallego, supra,* 18 Cal.4th at pp. 832-835.)

The circumstances upon which respondent relies do not establish that petitioner or his counsel possessed such triggering facts at the time of the 1983 trial, and hence should have known about the prosecution's alleged misrepresentations concerning the discovery at issue in the Garton subclaim. Numerous analogous passages concerning examination of witnesses regularly appear throughout thousands of pages of transcripts in automatic

[11]As we explained in *Clark, supra,* 5 Cal.4th 750, 783, Policy 3, *supra,* standard 1-1 "for the first time, impose[d] an express obligation on counsel representing appellants in capital cases to investigate possible bases for habeas corpus [relief]." (See also 5 Cal.4th at p. 785; Policy 3, *supra,* former std. 2-2 as adopted eff. June 6, 1989 ["Appellate counsel should expeditiously investigate possible bases for filing a petition for a writ of habeas corpus."].)

[12]We stated in *Clark, supra,* that counsel's duty "is limited . . . to an investigation of potentially meritorious grounds for habeas corpus [relief] which have come to counsel's attention in the course of preparing the appeal. The appointment does not impose on counsel an obligation to conduct an unfocused investigation having as its object uncovering any possible factual basis for a collateral attack on the judgment. Only an investigation into specific facts known to counsel which could reasonably lead to a potentially meritorious habeas corpus claim is anticipated and required." (5 Cal.4th at pp. 783-784.)

[13]We recently amended Policy 3, *supra,* standard 1-1, consistently with the above, in response to Senate Bill No. 513, 1997-1998 Regular Session (Stats. 1997, ch. 869). Effective January 22, 1998, that standard, as pertinent, reads as follows: "Habeas corpus Appellate counsel in a capital cases shall have a duty to investigate factual and legal grounds for the filing of a petition for a writ of habeas corpus. The duty to investigate is limited to investigating potentially meritorious grounds for relief that have come to counsel's attention in the course of reviewing appellate counsel's list of potentially meritorious habeas corpus issues, the transcript notes prepared by appellate counsel, the appellate record, trial counsel's existing case files, and the appellate briefs, and in the course of making reasonable efforts to discuss the case with the defendant, trial counsel and appellate counsel preparing the appeal. The duty to investigate It does not impose on counsel an obligation to conduct, nor does it authorize the expenditure of public funds for, an unfocused investigation having as its object uncovering all possible factual bases for a collateral attack on the judgment. Instead, counsel has a duty to investigate potential habeas corpus claims only if counsel has become aware of information that might reasonably lead to actual facts supporting a potentially meritorious claim. All petitions for writs of habeas corpus should be filed without substantial delay." (Underscoring and strikethroughs indicate changes from earlier version.)

The amended standard merely clarifies the previously imposed duty, and accounts for the involvement, under the recent legislation, of separate direct appeal and habeas corpus counsel. The amendment effects no substantive change in the scope of counsel's duty to conduct a habeas corpus investigation.

appeals, and yet counsel is neither required nor expected to launch habeas corpus investigations to explore the speculative possibility of false or misleading statements to the court in each such instance. We do not expect counsel to undertake, nor need this court fund, unfocused "fishing expeditions."[14] (See *Clark, supra,* 5 Cal.4th at pp. 783-784 & fn. 19; *Ashmus* v. *Calderon* (9th Cir. 1997) 123 F.3d 1199, 1208 ["states need not compensate counsel for a fishing expedition"], revd. on jurisdictional grounds *sub nom. Calderon* v. *Ashmus* (1998) 523 U.S. 740 [118 S.Ct. 1694, 140 L.Ed.2d 970].)[15]

Accordingly, we reject respondent's assertion that petitioner has long possessed triggering facts indicating a possible factual basis for a claim that the prosecution lied in the course of discovery, and therefore should have known of the Garton subclaim. For the same reasons, we similarly reject respondent's related argument that, because the record reveals "seemingly endless on-the-record disputes and disagreements about the prosecution's compliance with discovery with respect to petitioner's statements to the

---

[14]We reject any suggestion that a contrary view, or a duty broader than we recognize, is compelled by *McCleskey* v. *Zant* (1991) 499 U.S. 467 [111 S.Ct. 1454, 113 L.Ed.2d 517]. The opinion in *McCleskey* states only that a "petitioner must conduct a *reasonable* and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." (*Id.* at p. 498 [111 S.Ct. at p. 1472], italics added.) *McCleskey* nowhere suggests that a "reasonable" investigation is one grounded on mere speculation or hunch, without any basis in triggering fact, and no decision of which we are aware has recognized or imposed such an unfocused and broad duty.

[15]Contrary to the Ninth Circuit Court of Appeals' reading of *Clark, supra,* 5 Cal.4th 750, in *Ashmus* v. *Calderon, supra,* 123 F.3d 1199, as we have explained *ante,* at pages 791-793, *Clark* does not limit counsel's duty to investigate—nor does it limit the availability of habeas corpus investigation funds—to "claims that are discoverable by reference to the four corners of the appellate record" or claims that are "revealed by the record." (*Ashmus* v. *Calderon, supra,* 123 F.3d at p. 1208.)

Of course, a duty to investigate (and entitlement to funding therefor) *may* arise based on triggering facts that appear on the face of the record. The record may, for example, affirmatively disclose triggering facts that would lead reasonable counsel to investigate a possible claim of juror misconduct, or ineffective assistance of counsel. (See *Clark, supra,* 5 Cal.4th 750, 800 (conc. opn. of Lucas, C. J.).)

But as we also made clear in *Clark,* a duty to investigate (and entitlement to funding or reimbursement therefor) also may arise based upon triggering facts that appear nowhere on the face of the record, but which, instead, have "come to counsel's attention in the course of preparing the appeal." (*Clark, supra,* 5 Cal.4th at p. 784.) For example, if, in the course of interviewing his or her client, habeas corpus counsel discovers facts that would lead reasonable counsel to investigate a possible claim of incompetence to stand trial, or if, in the course of reviewing trial counsel's existing trial files and/or interviewing trial counsel, habeas corpus counsel discovers facts that would lead reasonable counsel to investigate a possible claim that the prosecution failed to comply with discovery or disclose material exculpatory information, counsel has a duty to investigate such claims.

As observed *ante,* at footnote 13, we recently further clarified—consistently with *Clark,* and in response to recent legislation—the scope of habeas corpus counsel's duty to investigate. Regarding the availability of funds with which to conduct a habeas corpus investigation, see *Gallego, supra,* 18 Cal.4th at pages 833-834.

police," this alone "constituted 'triggering facts' suggesting a basis for a possible habeas corpus claim" and that petitioner, therefore, should have known of the Garton subclaim.

Next, respondent asserts that petitioner himself long has known or should have known with whom he spoke in New Jersey in 1980-1981, and, accordingly, long has possessed the triggering facts suggesting a basis for the Garton subclaim. Respondent points to nothing, however, suggesting that petitioner knew or reasonably should have known of facts supporting the claim that the prosecution lied in the course of discovery.

Respondent also asserts that "even if the prosecutor misrepresented his efforts, the information in the Garton declaration, upon which petitioner founds this subclaim, apparently always was available," and that accordingly petitioner should have discovered it much earlier. On this basis, respondent argues, the subclaim should be deemed "substantially delayed."

The mere "prior existence" of facts offered in support of a claim does not establish that a petitioner earlier knew or reasonably should have known of the existence of those facts, and respondent fails to suggest why petitioner earlier allegedly knew or reasonably should have known of the existence of the information set out in the Garton declaration. To the extent respondent intends to assert that counsel had a duty to conduct an "unfocused investigation having as its object uncovering any possible factual basis for a collateral attack on the judgment" (*Clark, supra,* 5 Cal.4th 750, 784), as observed *ante,* footnote 12, we have expressly rejected that view.

Finally, respondent asserts that "even if it cannot reasonably be concluded that petitioner and his current and previous counsel knew or should have known of facts supporting the claim, presentation of it at this late date still should be deemed untimely." Respondent asserts that "proper accommodation of the societal interests undermined by belated habeas corpus petitions must sometimes allow for the barring of belated claims irrespective of whether the petitioner had reason to believe the claim existed, as long as the state did not unconstitutionally prevent him from discovering the claim." Respondent also suggests that in determining the timeliness of a petition filed after the date prescribed in Policy 3, *supra,* standard 1-1.1, this court should require "an affirmative showing sufficient to outweigh" such competing societal interests in finality.

As already noted, the Garton subclaim rests on allegations that the prosecution wrongfully withheld relevant information from defense counsel prior to trial, lied to the court and defense counsel about the matter in presenting

rebuttal witnesses at trial, and thereafter resisted investigative efforts by the defense to obtain access to the prosecution's records. Under these circumstances, we do not believe it is accurate to characterize the claim, as respondent suggests, as one in which "the state did not unconstitutionally prevent [petitioner] from discovering the claim." Accordingly, we need not determine whether, as respondent urges, there possibly may be some other circumstances in which the societal interest in finality is so significant and the state so clearly is without responsibility for any delay that it would be appropriate to bar as untimely a habeas corpus claim of which a petitioner reasonably was unaware.

We conclude that petitioner has established that the information offered in support of the Garton subclaim of Claim I was obtained in July 1995, and that the information neither was known to petitioner, nor reasonably should have been known to him, at any earlier time.[16]

### (ii) *Has petitioner established that the Garton subclaim of Claim I was presented without substantial delay?*

The present petition—filed on September 18, 1995—was filed reasonably promptly after petitioner discovered (in April or May 1995) the relevant triggering facts and thereafter obtained (in July 1995) the information (the Garton declaration) offered in support of the Garton subclaim of Claim I. Accordingly we conclude that petitioner has satisfied his burden of establishing that this subclaim was not substantially delayed. Thus, this subclaim is not procedurally barred as untimely.

---

[16]As noted above, petitioner not only has alleged, with specificity, facts showing the timeliness of the Garton claim, but also has referred to attached declarations that support the allegations and place them in context. Although, in some situations, sufficiently specific allegations may be enough to establish absence of substantial delay, the filing of and reference to such declarations frequently will be helpful, and may be essential to sustain a petitioner's burden of establishing absence of substantial delay. For example, in the face of declarations filed by the respondent, this court may find that a petitioner who has failed to provide and cite adequate supporting declarations or counter-declarations has not met his or her burden of establishing the timeliness of a claim, despite the ostensible sufficiency of the allegations alone. (Cf. *People* v. *Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252] [habeas corpus petitioner should "include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations"]; *People* v. *Romero* (1994) 8 Cal.4th 728, 737 [35 Cal.Rptr.2d 270, 883 P.2d 388] ["If the court determines that the petition does not state a prima facie case for relief or that the claims are all procedurally barred, the court will deny the petition outright," and may do so without requesting an informal response from the respondent pursuant to California Rules of Court, rule 60.].)

### 2. Alleged withholding of evidence that could have been used to impeach prosecution witness Fitzgerald
#### (Claim I, paragraphs 13-14—the Fitzgerald/Halliday subclaim)

At trial, prosecution rebuttal witness John Fitzgerald, a private citizen, testified concerning the timing of the Dallas dumpster fire. He explained that he left a bar with a friend, "Kevin Holliday" (the correct name is Scott Kevin Halliday), at approximately 1:15 a.m. on December 28, 1979.[17] After driving three or four minutes, he noticed smoke rising over the roof of a department store building and mentioned this to his passenger. Fitzgerald explained that because he assumed that the smoke originated from an incinerator behind the building, he made no report to the fire department. Later, after hearing a radio report about the fire, Fitzgerald returned alone to the location of the fire and lingered at the scene as the fire was doused.

On cross-examination, defense counsel elicited the following testimony: Fitzgerald could not recall Halliday's precise address, but remembered that Halliday had been a friend of his at Richland Junior College, and that Halliday also had attended the University of Texas. Fitzgerald had not seen Halliday again, but had spoken with him by telephone a few days after the fire, and he attempted to telephone Halliday at the same telephone number shortly before testifying at the trial (i.e., in 1983).

In the present habeas corpus petition, petitioner supplies as exhibits two reports, each prepared by the district attorney's investigator, Carole Piceno, prior to Fitzgerald's trial testimony. The first report is of Piceno's February 25, 1983, interview with Fitzgerald, who relayed information consistent with Fitzgerald's subsequent testimony at trial. The second report is of Piceno's February 26, 1983, telephone interview with Scott Kevin Halliday, who stated he did not recall seeing smoke rising over the department store building three years earlier, and did not "specifically recall" anyone named John Fitzgerald.[18] Petitioner also supplies a third report, prepared by the

---

[17]Fitzgerald testified that he remembered the time because he wanted to leave before the 2:00 a.m. closing time to "avert the possibility of driving amongst drunks."

[18]Contrary to representations in the petition, the report contains no assertion by Halliday that he "denied" knowing Fitzgerald, nor does it contain any assertion that Halliday "denied having been at the Madison Bar and Grill in the early morning hours of December 28, 1979, and denied having been given a ride home by John Fitzgerald at that or any other time." The report states simply that Halliday had "numerous friends and acquaintances" during his years at Richland Junior College and the University of Texas, and that he did not "specifically" or "independently recall"—three years after the events—such incidents or such a person.

Dallas Police Department shortly after the dumpster fire, which, according to petitioner, in part contradicts Fitzgerald's trial testimony.[19]

Petitioner asserts: "None of this impeaching information . . . was properly disclosed to trial counsel for petitioner by the prosecutor at any time before, during or after his presentation of Fitzgerald's rebuttal testimony. . . . Had any of this significant impeachment material been disclosed to trial counsel during petitioner's trial, and had [it] been brought forth before the trier of fact, no reasonable juror would have found Fitzgerald's testimony credible under these highly suspicious circumstances. The prosecutor knowingly suppressed this damaging impeachment material. . . ."

We proceed to address the procedural question at issue here—the timeliness of petitioner's claims that the prosecution improperly withheld the above described reports.

### a. *Substantial delay*

As explained below, petitioner carries his burden as to the Fitzgerald/Halliday subclaim.

(i) *When was the information offered in support of the Fitzgerald/Halliday subclaim of Claim I obtained, and was it known, or should it reasonably have been known, by petitioner at any earlier time?*

As noted above, petitioner asserts *generally* that he "became aware of the factual and legal basis" for Claim I (including, apparently, the Fitzgerald/Halliday subclaim) no earlier than mid-June 1995. Standing alone, this general allegation does not establish when information offered in support of the Fitzgerald/Halliday subclaim was obtained, and that the information offered in support of the subclaim was neither known, nor reasonably should have been known, at any earlier time.

Subsequently, in the part of the petition addressed to the merits of the Fitzgerald/Halliday subclaim, the petition asserts: "The prosecutor did not disclose any of this possible impeachment evidence to trial counsel for Petitioner when he learned of it or any time thereafter." In addition, the petition refers specifically to the declaration of Attorney Richard Chapnik, who, as noted, has assisted petitioner's appointed counsel in this matter. As

---

[19]The report, contrary to Fitzgerald's trial testimony, asserts that Fitzgerald told police officers that he had been the first to see the dumpster fire and that he had been the first to arrive at the scene. The document also reports that Fitzgerald told the police: " 'I guess I screwed up by hanging around' " and " 'I guess I have seen more of this than you have.' "

explained above, Chapnik asserts that in early 1993 he commenced investigating the circumstances of petitioner's custody in New Jersey, and that when, in mid-1995, petitioner finally obtained access to the district attorney's files under federal subpoena, he discovered "heretofore unknown and suppressed facts concerning the evidence introduced" by the state at petitioner's trial. Included in this material, Chapnik asserts, was "valuable impeachment evidence [apparently, the above described Fitzgerald and Halliday reports] concerning prosecution rebuttal witness John M. Fitzgerald. Pursuing that lead, counsel for Petitioner sent a trained investigator . . . to Dallas, Texas, to interview key prosecution trial witnesses."

Respondent, in its return, contends that the two reports "apparently were disclosed to the defense prior to Fitzgerald's rebuttal testimony at the trial in 1983." In support, respondent cites an attached declaration of Santa Barbara District Attorney Sneddon, who asserts that it was and remains his practice to disclose all such matters to defense counsel, and that he is "certain" the reports at issue were disclosed to petitioner's trial counsel, Jake Stoddard.[20]

In his traverse, petitioner asserts: "Neither Petitioner nor his [trial] counsel knew, should have known, or were on 'notice' of the 'Fitzgerald and Halliday reports' or of the availability of a potentially meritorious habeas corpus claim." In support, petitioner cites an exhibit that is appended to the traverse. In that exhibit, a law clerk for appointed counsel declares that she reviewed copies of trial counsel Jake Stoddard's files, believes those files were complete, and searched those files "for the specific purpose of locating any correspondence or documents pursuant to or relating to Carole Piceno's Texas investigation, or any statements about Jerry E. Foster, John M.

---

[20]In his traverse, petitioner moves to strike, as "untimely" and irrelevant, the Sneddon declaration and two other exhibits: copies of Texas court documents evidencing petitioner's *1984* plea of guilty to the murder of Steven Little, and a declaration of District Attorney Investigator Piceno, asserting, in response to allegations by Dallas Fire Department Captain Foster (see *post*, fn. 24), that she has "no recollection that Captain Foster, while in my presence, was ever ordered to testify in the manner he now describes, nor do I have any recollection that Captain Foster expressed any reluctance to testify." Although we do not rely upon the two declarations in resolving the procedural issues before us, the record of the plea is of some value to our resolution of one procedural issue (see *post*, fn. 33), and none of the three exhibits is irrelevant.

Moreover, the prosecution's production of the exhibits was not untimely. Petitioner purports to quote *People* v. *Duvall, supra,* 9 Cal.4th 464, 476, as standing for the proposition that respondent is obligated to " 'provide *in the Informal Response* such documentary evidence, affidavits, or other materials as will enable the court to determine which issues are truly disputed.' " (Italics added.) Our opinion does not contain the italicized language and, instead, specifically addresses only respondent's duty to provide documentary evidence in the "*return.*" (*Ibid.*, italics added.) Nothing in *People* v. *Duvall, supra,* 9 Cal.4th 464, suggests, much less holds, that respondent is obligated to provide such documentary evidence in an informal response.

Fitzgerald or Scott Kevin Halliday. [¶] After careful review, I failed to uncover any information related to the Piceno investigation in the copies of trial counsel's files." In addition, petitioner asserts in his traverse that had trial counsel been given the reports, counsel "certainly" would have used them at trial to impeach Fitzgerald, and the fact that counsel did not do so is circumstantial evidence that counsel was not given the reports.

The Attorney General relies upon Sneddon's declaration in asserting that petitioner's withholding claim is untimely. Sneddon's declaration, however, does not go to the issue of the *timeliness* of the withholding claim, but rather to the *existence* of the claim in the first instance. Sneddon's declaration does not suggest that petitioner or his counsel *knew, or should have known, of the withholding claim earlier* and improperly delayed in the filing of the claim, but rather contends that the prosecution, in fact, timely disclosed the report in question, and thus that there is no basis whatsoever for petitioner's claim that the report was withheld. Although Sneddon's declaration is unquestionably relevant to the merits of petitioner's withholding claim, it does not indicate that the "failure to disclose" claim was improperly delayed or not brought in a timely fashion.

Reading together the above described passages of the petition and traverse,[21] we conclude that petitioner has established that the information offered in support of the Fitzgerald/Halliday subclaim of Claim I was obtained in mid-1995, and that the information neither was known to petitioner, nor reasonably should have been known to him, at any earlier time.[22]

(ii) *Has petitioner established that the Fitzgerald/Halliday subclaim of Claim I was presented without substantial delay?*

The petition containing the Fitzgerald/Halliday subclaim of Claim I was filed reasonably promptly after petitioner obtained the factual and legal basis for the subclaim in mid-1995. Accordingly, we conclude that petitioner has satisfied his burden of establishing that this subclaim was not substantially delayed. Thus, this subclaim is not procedurally barred as untimely.

---

[21]Petitioners should in the future clearly present *in the petition* specific allegations (with appropriate references to, and description of, any supporting exhibits that may be provided) concerning when information offered in support of *each claim and subclaim* was obtained, was known, and reasonably should have been known.

[22]As we have done with reference to the Garton subclaim, we reject respondent's arguments that the Fitzgerald/Halliday subclaim of Claim I is substantially delayed because (i) counsel for petitioner assertedly had a duty to conduct an unfocused "fishing expedition" habeas corpus investigation, and (ii) even if petitioner neither knew nor reasonably should have known of the information offered in support of the various subclaims, this subclaim nevertheless is barred by an "outweighing" interest in finality.

### 3. *Alleged perjury/false testimony of prosecution witnesses (Claim I, paragraphs 7-12—the Foster subclaim)*

On the issue of the timing and origin of the Dallas dumpster fire in which Steven Little's body was found, the prosecution at trial called Dallas Fire Department Captain Jerry Foster.[23] Petitioner asserts that Foster's testimony establishing the time of the fire as early as 11:00 p.m. on December 27 was "false" and/or "perjured," and that Foster, in the presence of a representative of the Santa Barbara District Attorney's office, specifically was directed by a "Division Chief" of the Dallas Fire Department to "testify falsely as an expert witness at Petitioner's California trial." In support, petitioner offers the declarations of Foster and two other officials of the Dallas Fire Department, all dated in mid-May 1995.[24]

---

[23]Foster testified that he arrived at the location of the fire at approximately 9:00 a.m. on December 28, 1979—i.e., almost seven hours after the fire was reported and extinguished. Foster recounted that the dumpster was about two-thirds full, that approximately 90 percent of the contents was comprised of cardboard boxes that had been collapsed, and that a lab report disclosed no presence of accelerants. Foster stated that in view of the report that about 20 minutes after 1:00 a.m. on December 28, a passerby (Fitzgerald) had observed smoke over the roof of the building behind which the dumpster was parked, the fire "had to have started prior to, or around, 1:00" a.m., and that it "could have been burning for several hours before that"—i.e., as early as 11:00 p.m. on December 27, 1979. Elaborating, Foster testified that the start of the fire might have been earlier (11:00 p.m.) rather than later (around 1:00 a.m.) because, in the absence of accelerants, cardboard tends to burn very slowly. He observed that if an accelerant had been found, "that would cut the time period down."

On cross-examination, Foster stated that the fire was not officially reported until a neighbor phoned the fire department at 2:14 a.m. (As noted above, Fitzgerald testified that he observed smoke rising over the building and coming from the dumpster area at about 1:17-1:18 a.m.) Foster conceded that he was told by another officer that one top panel of the dumpster had been open when the fire department arrived, and that the fire "would tend to smolder longer if [the dumpster had been] totally closed up." He also observed, however, that an open dumpster "in the wintertime" might also produce damp or wet trash, which would tend to smolder, and that this was a "consideration." Finally, Foster agreed that it was impossible to state with any degree of specificity the length of time the fire would have smoldered before smoke became visible to passersby over the roof of the building, and that he had formed his "best guess" opinion about when the fire started only "within the last couple of weeks," although the fire had occurred three years earlier.

[24]Jerry Foster declares, in relevant part, as follows: He was a "rookie investigator" at the time of the dumpster fire; the "primary investigator," Royce Bonsal, prepared the official report on the fire; Foster was not asked until the time of petitioner's trial in 1983 to consider and determine at what time the fire had started or how long it had burned; shortly before his testimony at petitioner's trial, he was ordered by his "Division Chief," in the presence of a person from the Santa Barbara District Attorney's office, to testify as an expert witness; he was "uncomfortable" with the prospect of testifying as an expert, and so stated, but was told he had no choice; he knew that he "could not pinpoint how long the fire had burned"; he did not speak with Royce Bonsal before testifying; although it is "possible"—as he testified at trial—that the fire "could have started up to three hours prior to smoke being seen," this is neither "probable [n]or likely"; and finally, at the time Foster testified, he was not asked "what the probable or likely time frame was for the fire to have started." Foster concludes that

We proceed to address the timeliness of petitioner's claims concerning asserted false and/or perjured testimony by Captain Foster.

### a. *Substantial delay*

As explained below, petitioner carries his burden as to the Foster subclaim.

the fire "probably started 30 minutes or less before someone reported it to the Fire Department"—i.e., about 1:45 a.m. (Again, the fire was reported at 2:14 a.m.)

Royce Bonsal, who, as noted, was the primary investigator of the dumpster fire, declares that he arrived at the fire scene shortly after the police arrived, in the early morning of December 28, 1979 (as noted above, Foster did not arrive until about 9:00 a.m. on that day); Bonsal was not asked to determine at what time the fire had started or how long it had burned; he did not conduct an investigation into the origin of the fire; it would take only "ten or fifteen minutes for the fire in that dumpster to build up enough smoke for anyone passing to see it"; and finally, "the fire would not have smoldered, smoked or burned for longer than fifteen minutes before the fire department was called"—which, as noted, occurred at 2:14 a.m. Bonsal concludes that if he had been contacted and questioned, he would have given the foregoing statements at trial.

David Norberg, the first firefighter to arrive at the scene of the dumpster fire, declares as follows: At 2:14 a.m. on December 28, 1979, the dumpster fire was reported; after extinguishing the fire, Norberg noticed the body of a child lying atop partially burned newspapers and other partly burned cardboard and paper material; "the fire had not burned very deep or for very long," and had not burned down the sides of the interior dumpster panels; and, finally, there was no excessive charring of the dumpster contents. Norberg concludes that based on what he viewed at the scene, and the proximity of the fire to houses and a busy intersection "where smoke would be quickly noticed," he believes that "the fire in the dumpster could not have been burning for 30 minutes prior to being reported" at 2:14 a.m. Norberg adds that if he had been contacted and questioned, he would have given the foregoing statements at trial.

As noted, petitioner argues that Foster's testimony was false and perjured. Foster's testimony was opinion, however, and opinion testimony does not constitute perjury merely because the witness later changes his or her opinion, nor does it constitute perjury merely because the initial opinion later proves to be "incorrect." Testimony is perjured only if the witness does not honestly hold the opinion to which he or she testifies. Foster's opinion testimony had two basic components: first, that the fire "had to have started prior to, or around, 1:00" a.m.; second, that it could have started as early as 11:00 p.m. As to the first component, the opinion was premised expressly on the assumed accuracy of Fitzgerald's testimony that he saw smoke coming from the dumpster at about 1:20 a.m. Given that assumption, Foster's trial testimony is not inconsistent with his new declaration, which, in stating that the fire "probably" started at around 1:45 a.m., apparently ignores Fitzgerald's trial testimony in that regard. As to the second component, we observe that Foster's declaration does not contradict, much less recant, his trial testimony. Indeed, as noted above, in his present declaration Foster continues to assert that it is "possible" that the fire "could have" started up to three hours "prior to smoke being seen," thereby reaffirming his trial testimony that the fire "could have" started as early as 11:00 p.m. Although Foster's declaration also offers the information that he felt unqualified, uncomfortable, and pressured into testifying, this does not in itself suggest, much less does it demonstrate, that his trial testimony was in any way "false" or that he committed perjury or that the prosecution knowingly permitted or promoted false or perjured testimony.

> (i) *When was the information offered in support of the Foster subclaim of Claim I obtained, and was it known, or should it reasonably have been known, by petitioner at any earlier time?*

As noted above, petitioner's *general* allegation that he "became aware of the factual and legal basis" for Claim I no earlier than mid-June 1995 does not establish when information offered in support of the Foster subclaim was obtained, and that the information was neither known, nor reasonably should have been known, at any earlier time. Subsequently, however, petitioner asserts in his traverse that he "became aware of those material facts alleged in declarations submitted in support of" this subclaim "by various . . . [fire department] officials of . . . [Dallas,] Texas [(see *ante*, fn. 24)] . . . at or about the time that those declarations were in fact obtained from [those fire department] officials" in mid-May 1995. In support of this specific allegation, petitioner cites the Chapnik declaration.

Chapnik's declaration asserts that petitioner's "investigator . . . discovered" the information offered in support of the Foster subclaim in mid-May 1995. The declaration asserts that petitioner sent an investigator to Texas to "pursue" a lead concerning prosecution witness Fitzgerald, and that "following up on that lead," habeas corpus counsel's "investigator also discovered that prosecution rebuttal witness Capt. Jerry Foster of the Dallas Fire Department had perjured himself in material testimony he gave at Petitioner's trial . . . ."

Petitioner also relies upon the declaration of his trial counsel, Jake Stoddard, which states in relevant part: "I recently reviewed the declaration from Jerry Foster of the Dallas Fire Department. The information about the contents of the dumpster supplied in his declaration regarding the dumpster fire was not disclosed in discovery. Had I been provided information showing his incompetence, I would have used it."

We conclude that petitioner has established that he obtained the information offered in support of the Foster subclaim in mid-May 1995, and that he neither knew, nor reasonably should have known, of that information earlier.[25]

---

[25]As we have done with regard to the other subclaims previously discussed, we reject respondent's arguments that the Foster subclaim of Claim I is substantially delayed because (i) petitioner should have known of the subclaim in that trial counsel's cross-examination of Foster assertedly provided triggering facts supporting an investigation into the subclaims; (ii) counsel for petitioner assertedly had a duty to conduct an unfocused "fishing expedition" habeas corpus investigation; and (iii) even if petitioner neither knew nor reasonably should

(ii) *Has petitioner established that the Foster subclaim of Claim I*
*was presented without substantial delay?*

The petition containing the Foster subclaim of Claim I—filed in September 1995—was filed reasonably promptly after petitioner obtained (in mid-1995) the information offered in support of that subclaim. We conclude that petitioner has satisfied his burden of establishing that this subclaim of Claim I is not substantially delayed, and thus this subclaim is not procedurally barred as untimely.

4. *Asserted promotion by the prosecution of alleged*
*perjury/false testimony of prosecution witness*
*(Claim I, paragraphs 15-18—the Holmes subclaim)*

In its case-in-chief at trial, the prosecution presented the testimony of Dallas Police Detective Truly M. Holmes, the officer to whom petitioner—while in New Jersey in 1981—confessed the Dallas killing of Steven Little. Petitioner asserts that Holmes committed perjury by testifying that petitioner's confession referred to facts that "could have been known only to those who had investigated the Little murder," and that the prosecution knowingly promoted this alleged perjury.[26] Petitioner contends that the information about the Dallas homicide assertedly suppressed by the police was in fact widely reported in the Dallas press shortly after that crime. In

have known of the information offered in support of the various subclaims, this subclaim nevertheless is barred by an overriding interest in finality.

[26]On cross-examination defense counsel questioned Holmes concerning whether he thought that petitioner might have confessed falsely to the Little murder out of a desire to assist the police. On redirect examination, the prosecution sought to dispel the insinuation that petitioner had confessed falsely, by asking Holmes whether petitioner had mentioned in the confession facts that could have been known only to those who had investigated the Little murder. Holmes replied, "That's correct." Thereafter, on recross-examination, *defense counsel* elicited from Holmes "several pieces of information" that "mostly only the true killer would know." Namely, Holmes testified that petitioner stated he "picked up Steven Little in a parking lot" located at an apartment complex, "explained the part about the dumpster behind a large building," and "explained that he threw [the victim's] clothes away."

Subsequently, the prosecution asserted during closing argument that petitioner's statement to Holmes contained points of "incredible coincidence" in which petitioner correctly reported details of the Dallas crime. The prosecution noted that petitioner correctly described the location where Steven Little had disappeared, the time of the disappearance, the location in the back of a building where the body was found, the manner and method of the homicide, the sodomization of the child, and the circumstance that the body was left in a burning dumpster that had been ignited without an accelerant. Based upon Holmes's testimony, we noted in our opinion that "[t]hroughout the confession, [petitioner] disclosed several details that only the culprit could have known." (*Robbins I, supra,* 45 Cal.3d at pp. 872-873.)

support, petitioner supplies copies of Dallas newspaper clippings dated December 28-31, 1979, reporting on the Steven Little killing.[27]

We proceed to address the timeliness of petitioner's claims that the prosecution promoted false and/or perjured testimony by Holmes.

### a. *Substantial delay*

As explained below, petitioner fails to carry his burden as to the Holmes subclaim.

> (i) *When was the information offered in support of the Holmes subclaim of Claim I obtained, and was it known, or should it reasonably have been known, by petitioner at any earlier time?*

As noted above, petitioner's *general* allegation that he "became aware of the factual and legal basis" for Claim I no earlier than mid-June 1995 does not establish when the information offered in support of the Holmes subclaim was obtained, and that the information was neither known, nor reasonably should have been known, at any earlier time.

There is no pertinent supplemental allegation in the petition or in the traverse from which we may conclude that petitioner has satisfied his obligation of establishing when information offered in support of the Holmes subclaim was obtained and that the information neither was known, nor reasonably should have been known, at any earlier time. In support of his general allegation that the information offered in support of this subclaim— which, as noted above, consists exclusively of 1979 clippings from Dallas newspapers—was discovered no earlier than mid-1995, petitioner relies upon the above described Chapnik declaration. Chapnik's declaration, however, does not assert that any triggering fact concerning this subclaim was discovered in petitioner's April-May 1995 review of the district attorney's files, and the declaration is silent concerning when the information (i.e., the newspaper clippings) offered in support of the Holmes subclaim was discovered. The declaration of petitioner's trial attorney, Jake Stoddard, suffers

---

[27]Petitioner does not assert that he actually learned the details of the Dallas killing from these news articles. The articles presumably were circulated in Dallas, but not California, well after petitioner by his own account had returned to California.

We observe that although it appears from the copies of the 1979 Dallas newspaper articles that some of the key details of the Steven Little homicide were not kept from the public by the Dallas police in 1979, petitioner offers no basis upon which to support his assertion that the California prosecutor promoted perjury by Holmes; petitioner cites nothing to suggest that the prosecutor was aware of the content of the articles at the time of the California trial in 1983. The cited exhibits, by themselves, fail to demonstrate that Holmes's testimony was perjured, or that the prosecution promoted any such perjury.

from the same defects: Stoddard fails to assert that the information previously was unknown, and he does not explain when the information offered in support of the subclaim was discovered. (Cf. *People* v. *Webster* (1991) 54 Cal.3d 411, 457 [285 Cal.Rptr. 31, 814 P.2d 1273].)

In his traverse, petitioner asserts that it is "obvious" that Stoddard did not know of the Dallas newspaper clippings at trial, because he would have used them to impeach Holmes if he had possessed them. This inference, however, does not satisfy petitioner's obligation to establish *when* he obtained the information and that the information should not have been discovered earlier. We reemphasize that *petitioner* bears the burden of establishing when information offered in support of the Holmes subclaim was obtained, and that the information was neither known, nor reasonably should have been known, at any earlier time.

> (ii) *Has petitioner established that the Holmes subclaim of Claim I was presented without substantial delay?*

Because petitioner has not alleged specific facts showing when he obtained the information offered in support of the Holmes subclaim, and that the information was not known, nor reasonably should have been known, at any earlier time, he has not established the absence of substantial delay as to that subclaim.

> b. *Good cause for substantial delay*

A claim or subclaim that is substantially delayed will nevertheless be considered on the merits if the petitioner can demonstrate "good cause" for the delay. (*Clark, supra,* 5 Cal.4th 750, 783 ["Our decisions have consistently required that a petitioner explain and justify any substantial delay in presenting a claim."]; *In re Walker* (1974) 10 Cal.3d 764, 774 [112 Cal.Rptr. 177, 518 P.2d 1129] (*Walker*), and cases cited [" '[A] convicted defendant must fully disclose his reasons for delaying in the presentation of' the facts upon which he would have a final judgment overturned."]; Policy 3, *supra,* std. 1-2 ["If a petition is filed after substantial delay, the petitioner must demonstrate good cause for the delay. A petitioner may establish good cause by showing particular circumstances sufficient to justify substantial delay."].)

We suggested one example of good cause for delay in *Clark, supra,* 5 Cal.4th 750. We explained that *known claims* "must be *presented promptly unless* facts known to counsel suggest the existence of other potentially meritorious claims which *cannot be stated without additional investigation.*" (*Id.* at p. 784, italics added.) In other words, if, for example, a petitioner has

investigated and "perfected"—i.e., completed written factual and legal argumentation regarding—three claims (A, B, and C) but he or she is continuing to conduct a bona fide "ongoing investigation" into another potential claim (D), the petitioner's "delayed" presentation of the former claims in a joint petition containing all four claims may be justified by "good cause"—the avoidance of piecemeal presentation of claims. (*Id.* at pp. 767-770, 777; see also *Gallego, supra,* 18 Cal.4th at p. 838 & fn. 13.)[28]

In the present case, petitioner alleges no such ongoing investigation as justification for his delay in presenting this or any other subclaim of Claim I.[29] He does, however, offer five other justifications for his delay, each of which we reject.

---

[28]We also stated in *Clark, supra,* 5 Cal.4th 750: "If the petition is delayed because the petitioner is not able to state a prima facie case for relief on all of the bases believed to exist, the delay in seeking habeas corpus relief may be justified when the petition is ultimately filed if the petitioner can demonstrate that (1) he had good reason to believe other meritorious claims existed, and (2) the existence of facts supporting those claims could not with due diligence have been confirmed at an earlier time." (*Id.* at p. 781.) In a footnote to that statement, we made clear that this basis for "good cause" exists only if the petitioner in fact "delays filing of the petition *in order to investigate* potential claims . . . ." (*Id.* at p. 781, fn. 17, italics added.) Thus, *Clark* indicates that good cause for delayed presentation of claims can be established only if, during the delay, the petitioner *was conducting an ongoing, bona fide investigation* of another claim or claims. A contrary interpretation of *Clark* would be inconsistent with the terms and purpose of the decision's discussion of this issue, and improperly would permit petitioners to establish good cause for the delayed presentation of known claims even if there was an intervening delay of years during which such claims sat on the shelf while there was *no* ongoing investigation into other potentially meritorious claims. Neither petitioner in this case, nor in the companion decision in *Gallego, supra,* 18 Cal.4th 825, suggests that a delayed presentation of known claims is authorized under *Clark* even if, during the period of the delay, a petitioner has not conducted an ongoing, bona fide investigation into other claims.

[29]In the petition, petitioner does briefly assert, in conclusory and general fashion: "[T]his petition raises claims based upon newly discovered evidence including Petitioner's mental illness and incompetence which was not available earlier. Upon appointment to this case, present counsel has diligently investigated all aspects of Petitioner's case and, in an effort not to present piecemeal litigation, has presented this petition only after the investigation of all potentially meritorious claims of which counsel is aware should have been made."

The foregoing general allegations are inadequate to establish good cause for the substantially delayed presentation of *any* claim set out in the petition. They refer only to ongoing investigation by *present* counsel, and do not demonstrate that any investigation was ongoing at the time the facts offered in support of the Holmes subclaim were obtained or reasonably should have been discovered.

In his traverse—which, in accordance with our order to show cause, is addressed solely to the procedural issue of the timeliness of Claim I—petitioner asserts that the information offered in support of each such subclaim of Claim I was neither known nor reasonably should have been known until 90 days before the filing of the petition. Regarding good cause for delay, the traverse focuses *exclusively* upon three explanations: asserted deliberate concealment by government agencies, petitioner's "mental health status," and alleged ineffective assistance of immediately preceding appellate and habeas corpus counsel.

Contrary to the premise of Justice Kennard's concurring and dissenting opinion, petitioner does *not* assert or even imply that the Holmes subclaim of Claim I was perfected and then

Petitioner first asserts his delay is justified because he was incarcerated in New Jersey "from the time the trial court pronounced sentence until shortly before present counsel was appointed in the United States District Court [i.e., September 1991]." This conclusory allegation fails to establish good cause for the delay. Indeed, as noted above, petitioner's absence from California did not prevent his immediately preceding counsel, the State Public Defender, from filing a six-issue habeas corpus petition in 1989.

Petitioner next asserts that, "[t]o the extent that the lack of any necessary information needed to raise these claims is the result of . . . the mental health status of Petitioner," this "constitutes an external objective factor impeding or preventing appellate counsel from raising these claims at any earlier time, and therefore . . . justif[ies] any substantial delay in raising these claims." Assuming, as alleged elsewhere in the petition, that petitioner was and remains mentally ill, he fails to demonstrate that this or any other claim presented in the petition could not reasonably have been developed earlier, without his personal assistance, by reasonably competent counsel. (See *People* v. *Kelly* (1992) 1 Cal.4th 495, 546-547 [3 Cal.Rptr.2d 677, 822

---

delayed for good cause pending his completion of an ongoing investigation into any other matter. Nor does petitioner allege or suggest as good cause for delay that, although he was aware of the information offered in support of the Holmes subclaim, he recognized that, by itself, that subclaim did not state a prima facie case and, accordingly, he withheld it until he discovered other related subclaims set out in Claim I that rise to the level of a prima facie case. Indeed, petitioner's contentions are to the contrary: First, as noted above, he asserts generally that he was *unaware* of both the factual and legal basis of *any* of the four subclaims set out in Claim I—including the Holmes subclaim—until mid-June 1995. Second, petitioner asserts the Holmes subclaim as an independent basis for relief. He argues that the alleged facts underlying the Holmes subclaim render it "highly probable that the results of the trial would have been more favorable to Petitioner" and "undermine any reasoned sense of confidence in the reliability of the actual outcome of Petitioner's trial."

Nor does petitioner assert or offer any explanation suggesting that Claim I is really a single combined claim of perjury, false evidence, and state withholding, the sum of which is greater than its individual component parts (none of which, standing alone, warrant relief), and that because presentation of most component parts of Claim I (i.e., the Garton information, the Fitzgerald/Halliday information, and the Foster information) is timely, the entire claim, including the Holmes subclaim, is timely. Although petitioner expressly denies respondent's assertion that petitioner has presented the Johnson information as an independent subclaim upon which petitioner seeks relief (see *ante*, fn. 6), petitioner does not make any such disclaimer with regard to the Holmes subclaim, but, as noted above, makes a contrary assertion.

In conclusion, petitioner's briefing does not advance, expressly or implicitly, any assertion that Claim I must be viewed as a symbiotic whole, the subclaims of which do not independently warrant relief, and that the whole claim must be found timely if any component part is timely. In view of the circumstance that petitioner has the burden to "explain and justify" (*Clark, supra*, 5 Cal.4th at p. 783), "fully disclose his reasons for" (*Walker, supra*, 10 Cal.3d at p. 774), or, in other words, "demonstrate good cause for" (Policy 3, *supra*, std. 1-2 ) his delay, we cannot excuse his delay based on any reason or factual supposition that petitioner has not advanced and cannot properly ascribe to petitioner "good cause" justifications that actually conflict with his own allegations.

P.2d 385].) Absent such a showing, petitioner's conclusory allegation concerning his mental health status fails to establish good cause for the substantially delayed presentation of any claim.

Third, petitioner contends there was good cause for his delay prior to July 1993—when we filed our opinion in *Clark, supra,* 5 Cal.4th 750—because, he alleges, prior to that time neither Policy 3 nor case law had made clear the obligation of appellate counsel to conduct a habeas corpus investigation and to file an appropriate habeas corpus petition. He relies upon declarations from his former counsel, Deputy State Public Defenders Michael Tanaka and Monica Knox, who assert they never understood that they were obligated to conduct a habeas corpus investigation and file habeas corpus claims based upon such an investigation.

Petitioner's contention is without merit. The obligation to conduct a habeas corpus investigation and to file an appropriate petition was stated clearly in June 1989, when we issued Policy 3, *supra,* which, in the introductory paragraphs thereto, makes it clear that capital appellate counsel's duty to investigate potentially meritorious habeas corpus claims and to present those claims without delay, applies to all capital matters regardless "whether the appeals therefrom are pending or previously resolved." (Accord, *Clark, supra,* 5 Cal.4th at p. 785.) Although *Clark* clarified Policy 3 (see *post,* fn. 30), nothing in *Clark* or the prior version of Policy 3 suggests petitioner or his counsel previously was excused from the obligation of conducting an appropriate habeas corpus investigation and filing an appropriate and timely habeas corpus petition.

We also reject petitioner's related argument that former counsel were obligated only to file a habeas corpus petition raising those "claims of which" counsel "actually [had become] aware," and that counsel had no duty to investigate leads—"triggering facts"—in order to discover other claims. This contention is erroneous, and, indeed, petitioner appears to concede as much elsewhere in his briefing. As explained in *Clark, supra,* 5 Cal.4th 750, prior to the adoption of Policy 3 in June 1989 case law established that "a person making a collateral attack on a final judgment must demonstrate diligence in *investigating* possible factual as well as legal bases for relief." (*Clark, supra,* 5 Cal.4th at p. 785, fn. 21, italics added, citing *In re Streeter* (1967) 66 Cal.2d 47, 52 [56 Cal.Rptr. 824, 423 P.2d 976] and *People* v. *Shipman* (1965) 62 Cal.2d 226, 230 [42 Cal.Rptr. 1, 397 P.2d 993].) Consistently with that authority, Policy 3, *supra,* standard 1-1 (quoted *ante,* p. 792) "impos[ed] an *express* obligation on counsel representing appellants in capital cases to *investigate* possible bases for habeas corpus." (*Clark, supra,* 5 Cal.4th at p. 783, italics added; see also *id.* at p. 785; Policy 3, *supra,* std.

2-2, as adopted June 6, 1989 ["Appellate counsel should expeditiously *investigate* possible bases for filing a petition for a writ of habeas corpus." (Italics added.)].) In view of the June 1989 adoption of Policy 3, *supra*, standard 1-1, petitioner's former counsel could not reasonably have believed that they had no duty to *investigate*—i.e., follow up on triggering facts regarding—information concerning potentially meritorious claims that came to their attention in the course of representing petitioner.

We conclude, contrary to petitioner's assertion, that he and his counsel were on notice as of June 1989 of the obligation to investigate potentially meritorious habeas corpus claims and to timely present those claims to this court.[30]

Fourth, petitioner asserts that "any substantial delay in raising these [subclaims of Claim I] at any earlier time is the direct result of official state interference in concealing and/or destroying evidence relating to the circumstances surrounding the prosecutor's solicitation of false and perjured testimony relating to the uncharged Texas offense. . . . These external objective factors impeded and prevented Petitioner from raising these [sub]claims at any earlier time than in this Petition, and thereby justify any substantial delay in raising these [sub]claims."

The premise of petitioner's argument is that the Holmes subclaim is *based upon information that was withheld* by Santa Barbara County officials until April or May 1995. As noted above, however, in our discussion of whether the Holmes subclaim of Claim I is substantially delayed, petitioner has failed to establish that the information upon which the Holmes subclaim is based— the 1979 Dallas newspaper articles—was *withheld* until 1995 by Santa Barbara County officials. Thus, we must reject petitioner's assertion that he has demonstrated that good cause for the substantially delayed presentation of the Holmes subclaim of Claim I is established by governmental or official interference.

Finally, petitioner asserts he was "prevented" from timely raising any of the subclaims presented in Claim I—or any of the other claims presented in the petition—by the ineffective representation provided by habeas corpus

---

[30]Petitioner asserts that until we clarified Policy 3, *supra*, standard 1-1.2, in *Clark, supra,* 5 Cal.4th 750, 785, footnote 21, his prior appellate/habeas corpus counsel "was only under the obligation to investigate facts *then known* to counsel . . . ." Although this characterization of counsel's investigative duties before *Clark, supra*, 5 Cal.4th 750, has been questioned (see *id.* at p. 800 (conc. opn. of Lucas, C. J.)), we need not resolve that issue here, because petitioner has failed to allege with specificity facts showing that the information offered in support of the Holmes subclaim was not *known* to him earlier than mid-June 1995. (See *ante*, at pp. 804-805.)

counsel, the State Public Defender. The petition alleges in general terms that "prior counsel did not raise clearly meritorious claims which were the subject of numerous pretrial and trial hearings. . . . Prior counsel was ineffective for failing to even investigate the effective assistance of trial counsel."

Without deciding whether, and to what extent, ineffective assistance of prior counsel may establish good cause for substantially delayed presentation of claims (see *Clark, supra,* 5 Cal.4th at pp. 779-780), we find no such basis of good cause for the delay here, because petitioner fails to state a prima facie case of constitutionally ineffective assistance of prior counsel with regard to the Holmes subclaim.

 One who asserts ineffective representation by counsel must establish both the objectively inadequate performance of that counsel, and prejudice. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [104 S.Ct. 2052, 2064-2069, 80 L.Ed.2d 674] [trial counsel]; *In re Harris* (1993) 5 Cal.4th 813, 833 [21 Cal.Rptr.2d 373, 855 P.2d 391] ["Similar concepts have been used to measure the performance of appellate counsel."].) The circumstance that present counsel has raised an issue not advanced by prior counsel does not itself establish inadequate performance by prior counsel. As the high court has observed, appellate counsel (and, by analogy, habeas corpus counsel as well) performs *properly* and *competently* when he or she exercises discretion and presents *only* the strongest claims instead of every conceivable claim. (*Jones* v. *Barnes* (1983) 463 U.S. 745, 752 [103 S.Ct. 3308, 3313, 77 L.Ed.2d 987]; *Smith* v. *Murray* (1986) 477 U.S. 527, 536 [106 S.Ct. 2661, 2667, 91 L.Ed.2d 434].)[31] As observed *ante,* footnote 27, the newspaper articles upon which petitioner's subclaim is based fail to demonstrate that Holmes's testimony was perjured, or that the prosecution promoted such perjury. Petitioner's prior counsel cannot be deemed to have performed inadequately by failing to raise a *meritless* claim of perjury or promotion of perjury. (Cf. *People* v. *Lewis* (1990) 50 Cal.3d.262, 289 [266 Cal.Rptr. 834, 786 P.2d 892].) Further, in light of the strength of the evidence of guilt presented at trial (see *Robbins I, supra,* 45 Cal.3d at pp.

---

[31]In *Jones* v. *Barnes, supra,* 463 U.S. at page 752 [103 S.Ct. at page 3313], the United States Supreme Court, quoting former Justice Jackson, observed: " 'Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one. . . . [E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one.' " Similarly, in *Smith* v. *Murray, supra,* 477 U.S. 527, 536 [106 S.Ct. 2661, 2667], the high court observed: "[The] process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."

884-885), any failing of prior counsel with respect to this subclaim was not prejudicial.

### c. *Exceptions to the bar of untimeliness*

*Clark, supra,* 5 Cal.4th at pages 797-798, recognized four exceptions to the bar of untimeliness: "(1) that error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner; (2) that the petitioner is actually innocent of the crime or crimes of which the petitioner was convicted; (3) that the death penalty was imposed by a sentencing authority which had such a grossly misleading profile of the petitioner before it that absent the trial error or omission no reasonable judge or jury would have imposed a sentence of death; [or] (4) that the petitioner was convicted or sentenced under an invalid statute." (Fns. omitted.)

We conclude that none of the four *Clark* exceptions to the bar of untimeliness apply to the Holmes subclaim.

### (i) *Error of constitutional magnitude*

In his argument regarding application of the first *Clark* exception, petitioner concentrates upon the prosecution's asserted knowing use of allegedly perjured evidence. He does not, however, demonstrate that the prosecution's alleged withholding constitutes "error of constitutional magnitude" leading to "a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner." (*Clark, supra,* 5 Cal.4th at p. 797, fn. omitted.)

■ Although the exception is phrased in terms of error of constitutional magnitude—which obviously may include federal constitutional claims—in applying this exception and finding it inapplicable we shall, in this case and in the future, adopt the following approach as our standard practice: We need not and will not *decide* whether the alleged error actually constitutes a federal constitutional violation. Instead, we shall assume, for the purpose of addressing the procedural issue, that a federal constitutional error is stated, and we shall find the exception inapposite if, based upon our application of state law, it cannot be said that the asserted error "led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would

have convicted the petitioner." (*Clark, supra,* 5 Cal.4th at p. 797, fn. omitted.)[32]

▉▉▉▉ Accordingly, assuming for the purpose of analysis only that the Holmes subclaim states "error of constitutional magnitude," we conclude, on the basis of the entire record, and pursuant to our application of state law (see *ante,* fn. 32), that such error did not lead to "a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner." Holmes's testimony was tangential to the ultimate question of petitioner's guilt of the Texas killing, and, as observed *ante,* at footnote 27, petitioner overstates the significance of the cited exhibits. The evidence regarding the Texas crime—including petitioner's confession thereto—was strong, and was supported by the striking and apparently objective testimony of a defense witness (see *ante,* fn. 3).[33] Likewise, the evidence of petitioner's guilt of the California killing and related lewd conduct, including petitioner's confession thereto, also was strong.

(ii) *Actual innocence*

Petitioner asserts that he actually is innocent. We proceed to address whether petitioner's purported evidence of innocence " 'undermine[s] the entire prosecution case and point[s] unerringly to innocence or reduced culpability.' " (*Clark, supra,* 5 Cal.4th at p. 798, fn. 33.)

We conclude, again on the basis of the entire record, and pursuant to our application of state law (see *ante,* fn. 32), that the prosecution's asserted promotion of alleged perjury by Holmes does not suggest, much less establish, that petitioner actually is innocent of any crime of which he was convicted. Again, as observed *ante,* footnote 27, petitioner overstates the significance of the cited exhibits. Nevertheless, assuming that the prosecution promoted—and that Holmes gave—false or perjured testimony in this

---

[32]We are aware that federal courts will not honor bars that rest "primarily" on resolution of the merits of federal claims, or that are "interwoven" with such claims. (*Coleman* v. *Thompson* (1991) 501 U.S. 722, 734-736 [111 S.Ct. 2546, 2556-2558, 115 L.Ed.2d 640].) The Ninth Circuit has held in *Siripongs* v. *Calderon* (9th Cir. 1994) 35 F.3d 1308 that "unless the state court *makes clear* that it is resting its decision denying relief on an independent and adequate state ground, it is *presumed* that the state denial was based at least in part upon federal grounds, and the petitioner may seek relief in federal court." (*Id.* at p. 1317, italics added.)

As explained in the text above and following, whenever we apply the first three *Clark* exceptions, we do so exclusively by reference to state law. When we apply the fourth *Clark* exception, we apply federal law in resolving any federal constitutional claim.

[33]In addition, as respondent observes, "petitioner has never repudiated his Texas confession under oath; and, in fact, he has since pleaded guilty in a Texas court to the Little murder."

regard, this would not constitute "irrefutable evidence of innocence of the offense or the degree of offense of which the petitioner was convicted." (*Clark, supra,* 5 Cal.4th at p. 798, fn. 33.)

### (iii) *Grossly misleading profile*

Petitioner asserts that the prosecution's asserted promotion of alleged false or perjured testimony by Holmes resulted in a death penalty that was "imposed by a sentencing authority which had such a grossly misleading profile of the petitioner before it that absent the trial error or omission no reasonable judge or jury would have imposed a sentence of death." (*Clark, supra,* 5 Cal.4th at p. 798.)

We conclude, once again on the basis of the entire record, and pursuant to our application of state law (see *ante,* fn. 32), that the prosecution's asserted promotion of alleged false or perjured testimony by Holmes would not bring petitioner within this exception. As we have explained, to fall within the exception "[t]he picture of the defendant painted by the evidence at trial must differ so greatly from his or her actual characteristics that the court is satisfied that no reasonable judge or jury would have imposed the death penalty had it been aware of the defendant's true personality and character-istics." (*Clark, supra,* 5 Cal.4th at p. 798, fn. 34.) Although presentation of "[f]alse or perjured evidence" *may* satisfy this *Clark* exception (*ibid.*), not *all* false or perjured evidence will create a "grossly misleading profile" (*id.* at p. 798), and the asserted promotion of alleged false or perjured testimony by Holmes clearly did not create a grossly misleading profile of petitioner. We conclude that, assuming for the purpose of analysis only that the prosecution promoted false or perjured testimony by Holmes, petitioner still would not fall within this exception to the bar of untimeliness.

### (iv) *Invalid statute*

Petitioner asserts that "Claim I . . . alleges facts which, if true, establish 'that the petitioner was convicted or sentenced under an invalid statute.' " He fails to explain, however, in what manner the prosecution's asserted promotion of alleged false or perjured testimony by Holmes implicates this excep-tion. We conclude that this exception to the bar of untimeliness is inappli-cable to Claim I. (See *ante,* fn. 32.)

Accordingly, petitioner has failed to demonstrate that the Holmes sub-claim falls within an exception to the bar of untimeliness.

### III

Because, as in the companion case (*Gallego, supra,* 18 Cal.4th 825), we confined the order to show cause in this matter to the procedural issues

discussed and resolved above, we do not address herein the merits of the claims raised in the petition, nor do we address herein the application of any procedural bar other than that of untimeliness. The petition for a writ of habeas corpus will be resolved, as is the normal procedure for such petitions, by summary order (see *Clark, supra,* 5 Cal.4th at p. 781), a copy of which is appended to this opinion. For the guidance of the parties, however, we shall address briefly and in broad outline the timeliness of the other claims presented in the petition.

The vast majority of the claims presented in the petition rely *exclusively* upon the appellate record. These claims were known, or reasonably should have been known, years ago and should have been presented to this court, if at all, in a habeas corpus petition filed much earlier. As to all such claims, petitioner fails to establish the absence of substantial delay or good cause for the delay, or that any of the four exceptions to the bar of untimeliness applies. ▮ ▮ ▮ ▮ Accordingly, we shall deny the claims that fall within this category as untimely, and on other applicable procedural grounds.[34]

---

[34]In order to provide guidance, we comment briefly upon various disparate aspects of our order practice:

We deny a claim "on the merits" when we conclude, after review, that no prima facie case for relief is stated as to that claim. In so doing, we understand that federal courts will honor independent and adequate state procedural bars even if the state court's procedural disposition is accompanied by an alternative disposition on the merits grounded upon federal law. (See *Harris* v. *Reed* (1989) 489 U.S. 255, 264, fn. 10 [109 S.Ct. 1038, 1044, 103 L.Ed.2d 308]; cf. *ante,* fn. 32 [state procedural bars resting even in part *on federal law* do not constitute independent and adequate state grounds].)

We apply the bars of *In re Dixon, supra,* 41 Cal.2d 756, 759 (*Dixon*) (barring a claim that should have been raised on appeal) and *In re Waltreus, supra,* 62 Cal.2d 218, 225 (*Waltreus*) (barring a claim that was raised and rejected on appeal), whenever it appears that either bar is applicable, with one exception. We do not apply those bars to claims of ineffective assistance of trial counsel, even if the habeas corpus claim is based solely upon the appellate record. (See *People* v. *Mendoza Tello* (1997) 15 Cal.4th 264, 267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

When a petitioner attempts to avoid the bars of *Dixon, supra,* 41 Cal.2d 756, or *Waltreus, supra,* 62 Cal.2d 218, by relying upon an exhibit (in the form of a declaration or other information) from outside the appellate record, we nevertheless apply the bar if the exhibit contains nothing of substance not already in the appellate record.

When, in our orders, we impose the bars of *Dixon, supra,* 41 Cal.2d 756, or *Waltreus, supra,* 62 Cal.2d 218, this signifies that we have concluded that none of the four exceptions set out in *In re Harris, supra,* 5 Cal.4th 813, apply. (See *id.* at pp. 829-841 [stating exceptions to the *Waltreus* bar]; *id.* at p. 825, fn. 3 [relating the same exceptions to the *Dixon* bar].)

Similarly, when in our orders we impose the bar of untimeliness, this signifies that we have employed the principles set out above and have determined that the petitioner has failed to establish the absence of substantial delay or good cause for delay, *and* that none of the four exceptions set out in *Clark, supra,* 5 Cal.4th 750, 798-799, apply.

When in our orders we impose, as to a given claim or subclaim, *both* the bar of *Waltreus, supra,* 62 Cal.2d 218, *and* the bar of untimeliness, this signifies that we have determined that

We shall not impose the bar of untimeliness as to three claims and three subclaims. In addition to the Garton, Fitzgerald/Halliday, and Foster subclaims of Claim I discussed above, we conclude that "Claim E," which is grounded in substantial part upon information offered in support of the Garton subclaim and asserts a violation of federal constitutional rights based upon alleged failure by the prosecution to comply with defense discovery requests, also is not substantially delayed. ▇▇▇ ▇ ▇ Nor shall we impose the bar of untimeliness as to petitioner's "Claim AK," which asserts ineffective assistance of appellate and prior habeas corpus counsel.[35] Finally, "Claim AN," which alleges juror misconduct, is based in substantial part upon information from outside the appellate record, and petitioner has met his burden of establishing that this claim is not substantially delayed.

## IV

The order to show cause is discharged.

Baxter, J., Werdegar, J., and Chin, J., concurred.

**MOSK, J.**—I concur in the result.

I agree that we must discharge the order to show cause. I do so because I believe that petitioner has not alleged specific facts that would entitle him to relief on habeas corpus.[1]

---

the claim or subclaim was raised and rejected on appeal, but that its re-presentation in the petition for a writ of habeas corpus also is untimely. Our imposition of the bar of *Waltreus*, in this context, signals that the claim has been exhausted in timely fashion on appeal.

Finally, when respondent asserts that a particular claim or subclaim should be barred under *Waltreus, supra,* 62 Cal.2d 218, or *Dixon, supra,* 41 Cal.2d 756, or the related bars of repetitiveness (*In re Miller, supra,* 17 Cal.2d 734, 735) or successiveness (see *ante,* fn. 9), or is untimely, and when, nevertheless, our order disposing of a habeas corpus petition does not impose the proposed bar or bars as to that claim or subclaim, this signifies that we have considered respondent's assertion and have determined that the claim or subclaim is not barred on the cited ground or grounds.

[35]Our past decisions have not determined from what date the timeliness of a claim of ineffective assistance of appellate or prior habeas corpus counsel should be measured, and in ruling upon prior petitions we sometimes have measured the timeliness of such a claim from the date of the appointment of present (i.e., "replacement") counsel *in this court.* Upon fuller consideration of the issue, we conclude that the timeliness of such a claim should be measured by the same standard that applies to all other claims. Accordingly, in the future, we shall measure the timeliness of such a claim from the date upon which the petitioner (or any counsel representing the petitioner) knew, or reasonably should have known, of the information offered in support of the claim of ineffective assistance of appellate or prior habeas corpus counsel.

[1]A habeas corpus petitioner must carry burdens of both pleading and proof. (See, e.g., *In re Sassounian* (1995) 9 Cal.4th 535, 546-547 [37 Cal.Rptr.2d 446, 887 P.2d 527].) Initially, he

I would rest, however, solely on the merits, and would not proceed to any of the so-called "procedural bars," including that of untimeliness.[2]

Like the majority, I am of the view that the writ of habeas corpus " 'was not created for the purpose of defeating or embarrassing justice, but to promote it[.]' " (Maj. opn., *ante*, at p. 777, quoting *In re Alpine* (1928) 203 Cal. 731, 744 [265 P. 947, 58 A.L.R. 1500].) That is especially so when, as here, the judgment that the petitioner challenges includes a sentence of death.

But, unlike the majority, I would follow the only path that would guarantee the attainment of justice in such a situation, namely the "examin[ation]" of "each" habeas corpus "petition on its own facts" in order to determine whether the petitioner has alleged specific facts that would entitle him to relief. (*In re Clark* (1993) 5 Cal.4th 750, 802-803 [21 Cal.Rptr.2d 509, 855 P.2d 729] (conc. and dis. opn. of Mosk, J.).)

To be sure, such "scrutiny" of the merits "requires the expense of considerable judicial resources . . . ." (*In re Clark*, *supra*, 5 Cal.4th at p. 803 (conc. and dis. opn. of Mosk, J.).) Consider the present petition, together with its "supplement": It contains 40 claims, with numerous subclaims, in hundreds of pages; it is supported by 213 exhibits, in several parts, filling pages numbering in the thousands.

Scrutiny of the merits, however, requires much less than does the effort to invoke each and every procedural bar. Or even the effort to invoke any one such bar. For proof, the reader need only peruse the many pages that the majority devote to the *single* procedural bar of untimeliness as to a *single,*

must carry the burden of alleging specific facts. (*Id.* at p. 546.) He must do that in his petition and, subsequently, in his traverse to any return by the respondent. (E.g., *People* v. *Duvall* (1995) 9 Cal.4th 464, 474-478 [37 Cal.Rptr.2d 259, 886 P.2d 1252].) If he succeeds, he must then carry the burden of proving such facts—to be precise, such facts as are material and subject to dispute (see *id.* at p. 478)—by a preponderance of the evidence. (*In re Sassounian*, *supra*, 9 Cal.4th at pp. 546-547.) He must do *that* at an evidentiary hearing before a referee (*People* v. *Duvall*, *supra*, 9 Cal.4th at p. 478), which is conducted pursuant to the rules of evidence (*In re Fields* (1990) 51 Cal.3d 1063, 1070 [275 Cal.Rptr. 384, 800 P.2d 862]).

[2]The majority make a novel departure from the law respecting the burdens of pleading and proof that a habeas corpus petitioner must carry (see, *ante*, at p. 815, fn. 1), at least for facts relevant to the procedural bar of untimeliness and perhaps for those relevant to others as well. They require him to carry his burden of proving such facts as he attempts to carry his burden of pleading them, and to do so, outside of any evidentiary hearing, in his petition and, if applicable, his traverse. They are at once too lenient, for they allow him to "prove" facts merely by alleging them, and too harsh, for they compel him to make the attempt in ignorance of the evidentiary rules that we may or may not choose to follow in a newly fashioned procedure that may fairly be characterized as a "nonevidentiary nonhearing."

patently unmeritorious, claim among *39* others. (See conc. and dis. opn. of Kennard, J., *post*, at p. 819, fn. 2.)[3]

Because principle and pragmatism show themselves in rare conjunction in this proceeding, as in all others in which the petitioner challenges a judgment including a sentence of death (see generally, *In re Gallego* (1998) 18 Cal.4th 825, 842-853 [77 Cal.Rptr.2d 132, 959 P.2d 290] (conc. and dis. opn. of Brown, J.)), I would rest solely on the merits and discharge the order to show cause accordingly.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the discharge of the order to show cause and in the denial of the petition for a writ of habeas corpus. But I do not agree with everything stated in the majority opinion, which addresses certain questions concerning the timeliness requirement for habeas corpus claims, elaborates on the timeliness pleading requirements for presumptively untimely habeas corpus petitions, and applies those pleading requirements to one of the forty claims in this habeas corpus petition. The majority divides this single claim into four subclaims and, upon application of the newly articulated pleading requirements, concludes that three of the subclaims have been timely presented but the other subclaim is barred as untimely. I would hold that the claim *as a whole* has been timely presented, and I would state, as the majority does not, that this court will not apply the newly articulated timeliness pleading requirements to bar claims in this and other pending petitions without affording the petitioner an opportunity to cure the deficiencies by amendment.

The basic timeliness requirement for habeas corpus petitions, under which a court ordinarily will not grant relief to a habeas corpus petitioner who has unreasonably delayed the presentation of claims urged as grounds for attacking the validity of a final judgment of conviction, is well established and not disputed here. If a habeas corpus petition presents only a single claim, determining whether the petitioner has unreasonably delayed the presentation of that single claim is usually a rather simple matter. But the claims urged in a habeas corpus petition attacking a California death judgment are

---

[3]The procedural bar of untimeliness is "indeterminate at [its] very core." (*In re Clark*, *supra*, 5 Cal.4th at p. 802 (conc. and dis. opn. of Mosk, J.).) Its operative phrases are "substantial delay" and "good cause." (See, e.g., maj. opn., *ante*, at p. 779.) Of course, its application to any given claim may yield varying results, as reasonable persons differ as to whether the claim in question has been presented without "substantial delay" and, if not, whether "good cause" exists for any such delay. But, worse yet, its very meaning is vague, as such persons attempt to discern the sense of "substantial delay" and "good cause." And its meaning will become vaguer still, if they are called on to consider whether a claim that is timely should somehow be deemed untimely because of a "societal interest[] in finality." (*Id.* at p. 794.) The majority assert that the procedural bar of untimeliness has caused petitioners to file their petitions more expeditiously. But they cannot deny that it has caused us to dispose of·such petitions at an altogether different pace.

seldom fewer than 10 and often more than 50, with many of the claims encompassing several subclaims and supported by facts that the petitioner or his counsel have discovered at various times. Determining the timeliness of each claim and subclaim in such a petition becomes extraordinarily complex, particularly in light of the tension between the timeliness requirement and the rule against piecemeal presentation of claims.

For some years, this court has labored to articulate a legal framework for making timeliness determinations in these multiclaim death penalty cases. The most important single step in this process was fixing a deadline, subject to certain exceptions, for the filing of habeas corpus petitions in death penalty cases. Petitions filed no more than 90 days after the final due date for the reply brief on the direct appeal receive a presumption of timeliness, whereas later filed petitions are deemed presumptively untimely. (Supreme Ct. Policies Regarding Cases Arising From Judgments of Death (Policies), policy 3, Standards governing filing of habeas corpus petitions and compensation of counsel in relation to such petitions, pt. 1, Timeliness standards, std. 1-1.1.) Another important step was defining what a petitioner would have to establish to avoid the bar of untimeliness as to claims urged in a presumptively untimely petition. This court has explained that the petitioner must establish either that the claim was presented without substantial delay, that the delay in presenting the claim was justified, or that the claim falls within one of the narrow exceptions to the timeliness requirement. (*In re Clark* (1993) 5 Cal.4th 750, 782-798 [21 Cal.Rptr.2d 509, 855 P.2d 729] (*Clark*).)

Although this basic legal framework for making the timeliness determination was fixed through the Policies and through this court's decisions in *Clark, supra,* 5 Cal.4th 750, and other cases, some points remained unclear. It was precisely to clarify those points that this court took the unusual step of issuing orders to show cause in this case and its companion (*In re Gallego* (1998) 18 Cal.4th 825 [77 Cal.Rptr.2d 132, 959 P.2d 290]) addressed solely to questions of timeliness.

The majority clarifies that a habeas corpus petitioner who contends that a claim has been presented without substantial delay "must allege, *with specificity*, facts showing when information offered in support of the claim was obtained, and that the information neither was known, nor reasonably should have been known, at any earlier time." (Maj. opn., *ante*, at p. 780, original italics.) To establish absence of substantial delay, the majority requires that presumptively untimely habeas corpus petitions contain these very specific discovery allegations not only as to each claim but also as to each subclaim. (Maj. opn., *ante*, at p. 799, fn. 21 ["*each claim and subclaim*" (original italics)]; *id.* at p. 805 ["claim or subclaim"].) The majority also clarifies that

a habeas corpus petitioner who contends that there is good cause for substantially delayed presentation of a claim or subclaim must allege separately and specifically, as to each claim and subclaim, each legal theory relied upon to establish good cause for delay. (*Id.* at pp. 806-807, fn. 29.) And the majority states that if a habeas corpus petitioner delays presentation of some fully developed claims pending investigation of other potential but not fully developed claims as to which the petitioner has triggering facts, the petitioner must allege that he was conducting an ongoing bona fide investigation of those potential but undeveloped claims throughout the period of delay.[1] (*Id.* at p. 806, fn. 28.)

I do not disagree with the pleading requirements that the majority articulates, even though Justice Brown makes a strong argument, in her concurring and dissenting opinion, that in these multiclaim death penalty cases the complexities of the timeliness determination are such that the burdens of applying the untimeliness bar far outweigh the resulting benefits.[2] But I would acknowledge, as the majority does not, that these newly clarified timeliness pleading requirements will not be applied to bar claims or subclaims in petitions pending in this court without affording the petitioner an opportunity to amend the petition, whenever possible, to cure the deficiencies.

It has long been established that a habeas corpus petitioner has the burden of "explaining any delay" in the presentation of a claim (*In re Bower* (1985) 38 Cal.3d 865, 872 [215 Cal.Rptr. 267, 700 P.2d 1269]) and must " 'fully disclose' " the reasons for the delay (*In re Walker* (1974) 10 Cal.3d 764, 774 [112 Cal.Rptr. 177, 518 P.2d 1129], quoting *In re Wells* (1967) 67 Cal.2d 873, 875 [64 Cal.Rptr. 317, 434 P.2d 613]). But our earlier decisions have never expressly required that the petitioner provide this explanation and make this disclosure separately *as to each subclaim* in a multiclaim petition, that the petition allege with specificity a *legal theory* of good cause for delay as to each subclaim, or that good cause for delayed presentation of developed claims will invariably require an *ongoing bona fide investigation* of undeveloped claims. Death penalty habeas corpus petitioners, and the counsel who represent them, had no notice of these previously unarticulated requirements. Indeed, had all these requirements been well and clearly established, there would have been no reason to issue the order to show cause in this case.

---

[1] This newly articulated ongoing-investigation requirement is the subject of my separate opinion in the companion case of *In re Gallego, supra,* 18 Cal.4th at pages 825, 840-842 (conc. and dis. opn. of Kennard, J.).

[2] One may begin to appreciate the extent of this burden by noting the length of the majority opinion, which addresses the timeliness of just one of forty claims presented in just one habeas corpus petition.

The majority applies the newly clarified timeliness pleading requirements to determine whether Claim I, which is but one of the petition's forty claims, is barred as untimely. The majority concludes that Claim I consists of four subclaims, that petitioner has established by specific allegations that three of these subclaims have been presented without substantial delay and thus are not barred as untimely, and that the fourth subclaim is barred as untimely because petitioner has failed to establish either the absence of substantial delay, good cause for delay, or an exception to the timeliness bar.

It is important to note that the majority, not petitioner, has divided Claim I into four subclaims. In the petition, Claim I is stated in 25 numbered sections, some with subsections. The title of Claim I states its legal theory: "The Prosecutor Introduced and Presented False Evidence Throughout the Guilt and Penalty Phases of Petitioner's State Court Trial Directly Affecting the Trial Outcome, Rendering the Results of the Trial Completely Unreliable and Fundamentally Unfair in Violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 7, 15, 16, 17, 24 and 27 of the California Constitution." Each of the 25 sections of the claim contains allegations in support of this false evidence theory, and the petition seeks relief based on all allegations in all sections of the claim.

The majority does not conclude that the various allegations that form the basis of Claim I have been improperly grouped together, either in the sense that they have no factual or legal relationship to each other, or in the sense that parts of them would independently warrant relief. Indeed, the decision to deny Claim I on the merits necessarily implies a determination that these facts, whether considered separately or together, do *not* state a prima facie case for relief. The majority makes this determination expressly as to the Holmes subclaim. (Maj. opn., *ante*, at pp. 810, 811, 812.) Thus, I do not understand the majority to hold that petitioner was mistaken in treating the Holmes allegations as part of a larger claim rather than as a separate and independent claim. In holding that the Holmes subclaim is barred as untimely, therefore, the majority of necessity relies on the newly articulated requirement that presumptively untimely petitions contain detailed time-of-discovery allegations not only as to claims, but also as to subclaims and parts of claims.

The majority appears to concede that a habeas corpus petitioner has no obligation to promptly present a subclaim that, by itself, fails to state a prima facie case for relief. The obligation to present without undue delay applies only to developed claims—that is, claims that state a prima facie claim for relief. A subclaim that fails to meet this threshold need not be presented unless and until the petitioner discovers and develops other subclaims that,

in habeas corpus counsel's judgment, may be combined with the previously known subclaim to state a prima facie case for relief. The majority declines to consider this justification for the delayed presentation of the Holmes subclaim only because, in the majority's judgment, petitioner has not clearly articulated it. (Maj. opn., *ante*, at pp. 806-807, fn. 29.)

The majority's approach is overly technical. "[I]n the administration of justice pleadings are a means to an end, not an end in themselves . . . ." (*Swanson* v. *Hempstead* (1944) 64 Cal.App.2d 681, 682-683 [149 P.2d 404]-683.) By definition, a subclaim is something less than or inferior to a claim, or a mere part of a claim. By pleading as a single claim what the majority chooses to view as four subclaims, petitioner has impliedly but clearly taken the position that these allegations are interrelated and interdependent. It is hardly surprising that petitioner, through counsel, does not expressly assert that each and every component allegation is essential to the claim for relief, an assertion that would be used against petitioner to justify denial of the entire claim if any single allegation was found to be factually unsupported or otherwise defective. Nor is it surprising that petitioner, through counsel, has not protested this court's division of Claim I into four subclaims, because counsel could not anticipate the legal consequences of this partition. What is important is that this court finds that the Holmes subclaim by itself does *not* state a prima facie claim for relief because, even assuming the Holmes evidence was false, its presentation did not affect the verdict in view of the other evidence demonstrating petitioner's guilt of the Texas murder of Steven Little. (Maj. opn., *ante*, at pp. 810, 811, 812 ["Holmes's testimony was tangential to the ultimate question of petitioner's guilt of the Texas killing . . . ."].) If, as the majority concludes (and I agree), the Holmes subclaim by itself did not establish prejudice sufficient to warrant relief, petitioner was under no obligation to present this subclaim until it could be combined with other false evidence subclaims relating to the same Texas murder. Because the petition does combine the Holmes subclaim with other such subclaims, and because those other subclaims have been presented without substantial delay (maj. opn., *ante*, at pp. 795, 799, 803), I would hold that Claim I is not barred as untimely.

**BROWN, J.,** Concurring and Dissenting.—For the reasons set forth in my concurring and dissenting opinion in *In re Gallego* (1998) 18 Cal.4th 825, 842-853 [77 Cal.Rptr.2d 132, 959 P.2d 290] (conc. and dis. opn. of Brown, J.), I concur only in the discharge of the order to show cause. I express no opinion on the merits of the substantive discussion regarding habeas pleading requirements but decline to endorse it.

Petitioner's application for a rehearing was denied September 23, 1998. Kennard, J., was of the opinion that the application should be granted.

APPENDIX

S048929

## IN THE SUPREME COURT OF CALIFORNIA

### IN RE MALCOLM J. ROBBINS ON HABEAS CORPUS

Petition for writ of habeas corpus denied.

Claim A is denied on the merits. In addition, it is barred as untimely under *In re Robbins* [(1998) 18 Cal.4th 770] (*Robbins*), and *In re Clark* (1993) 5 Cal.4th 750 [21 Cal.Rptr.2d 509, 855 P.2d 729] (*Clark*).

Claims B, C, and D are denied on the merits. To the extent they are based solely on the record, they should have been raised on appeal and are barred under *In re Dixon* (1953) 41 Cal.2d 756, 759 [264 P.2d 513] (*Dixon*). In addition, each claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claims E and F are denied on the merits. To the extent claim F is based on the appellate record, it is barred under *In re Waltreus* (1965) 62 Cal.2d 218, 225 [42 Cal.Rptr. 9, 397 P.2d 1001] (*Waltreus*). In addition, claim F is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim G is denied on the merits and barred under *Dixon, supra.* In addition, it is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim H is denied on the merits. Paragraph 2 thereof is barred under *Dixon, supra*, and paragraph 4 thereof is barred as waived under *People* v. *Green* (1980) 27 Cal.3d 1, 27-34 [164 Cal.Rptr. 1, 609 P.2d 468], and barred under *Dixon, supra.* In addition, the claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

The four subclaims advanced in Claim I (pars. 7-12, the Foster subclaim; pars. 13-14, the Fitzgerald/Halliday subclaim; pars. 15-18, the Holmes sub-claim; and pars. 20-22, the Garton subclaim) are each denied on the merits. In addition, the Holmes subclaim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim J is denied on the merits. In addition, the claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claims K, L, M, N, and O are denied on the merits and are barred under *Dixon, supra.* In addition, each claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim P is denied on the merits. Paragraph 2 thereof is barred under *Waltreus, supra,* and paragraphs 3, 4, and 5 thereof are barred under *Dixon, supra.* In addition, the entire claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim Q is denied on the merits and barred under *Dixon, supra.* In addition, it is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim R is denied on the merits. It also is barred under *Waltreus, supra,* and, to the extent it is based on constitutional theories not previously raised and rejected on appeal, it is barred under *Dixon, supra.* In addition, it is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim S is denied on the merits and barred under *Dixon, supra.* In addition, it is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim T is denied on the merits, and paragraph 2 thereof is barred under *Dixon, supra.* In addition, the claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim U is denied on the merits. In addition, the claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claims V and W are denied on the merits and barred under *Dixon, supra.* In addition, each claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim X is denied on the merits, and to the extent it is based solely on the record, it is barred under *Dixon, supra.* In addition, the claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claims Y and Z are denied on the merits and barred under *Dixon, supra.* In addition, each claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claims AA, AB, AC, AD, AE, AF, AG, and AH are denied on the merits, and to the extent they are based solely on the record, they are barred under *Dixon, supra.* In addition, each claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim AI is denied on the merits. To the extent this claim or any of its subparts was raised and rejected on appeal, it is barred under *Waltreus, supra;* to the extent this claim or any of its subparts was not raised on appeal, it is barred under *Dixon, supra.* In addition, the claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim AJ is denied on the merits and, to the extent it is based solely on the record, it is barred under *Dixon, supra.* In addition, the claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim AK is denied on the merits.

Claim AL is denied on the merits. To the extent this claim is premised on claims raised and rejected on appeal, it is barred by *Waltreus, supra.* To the extent this claim is premised on claims that should have been, but were not, presented on appeal, it is barred under *Dixon, supra.* In addition, the claim is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim AM is denied on the merits. In addition, it is barred as untimely under *Robbins, supra,* and *Clark, supra.*

Claim AN is denied on the merits. To the extent paragraph 9 thereof is based on the appellate record, it also is barred under *Dixon, supra.*

Insofar as any claim asserts ineffective assistance of immediately preceding appellate and habeas corpus counsel, it is denied solely on the merits. (*Robbins, supra,* at p. 815, fn. 35.)

Mosk, J., and Brown, J., would deny the petition solely on the merits.