Filed 3/8/24 In re Gomez on Habeas Corpus CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re GILBERT GOMEZ<br><br>on<br><br>Habeas corpus. | B320346<br><br>(Los Angeles County<br>Super. Ct. No. NA072648) |

ORIGINAL PROCEEDING; petition for habeas corpus. Tomson T. Ong, Judge. Petition granted.

Jonathan E. Demson for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Stephanie C. Santoro, Deputy Attorneys General, for Respondent.

# I.    INTRODUCTION

In 2008, a jury found petitioner Gilbert Gomez guilty of first degree murder (Pen. Code, § 187, subd. (a))[1], and found a criminal street gang sentencing enhancement (§ 186.22, subd. (b)(1)(C)) to be true.  The trial court sentenced petitioner to 25 years to life and a prior panel of this court affirmed the conviction (as well as the convictions of codefendants Benjamin Gonzalez, Spencer Bazan, and Gerson Bazan) with modifications not relevant to this proceeding.  (*People v. Gonzalez et al.* (Feb. 10, 2010, B211559) [nonpub. opn.].)

Petitioner now challenges his first degree murder conviction in light of the California Supreme Court's decision in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*).  We grant the petition.

# II.    FACTUAL BACKGROUND

The following factual background is taken from *People v. Gonzalez et al., supra*, B211559[2]:

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

[2]     On our own motion, we take judicial notice of that prior nonpublished opinion as well as the record in that appeal.  We also take judicial notice of the subsequent opinions, *People v. Gonzalez et al.* (Nov. 30, 2020, B300650) [nonpub. opn.] and *People v. Gonzalez et al.* (2023) 87 Cal.App.5th 869, as well as their appellate records.  Accordingly, we deny as moot petitioner's request for judicial notice of certain portions of the appellate

"On November 20, 2006, 14-year-old Geovonie Taylor was living with his cousins, Michael and Norman Cox, who were 16 and 18 years old. After school that day, Taylor met the Cox brothers at a friend's house. It was nighttime when they left the friend's house and decided to walk home. None of them was armed. They walked down Anaheim Street and began to turn down Gundry Avenue, near a construction site. There were three Hispanic males across the street, along with two Hispanic females. Taylor heard the males call out repeatedly, 'Eastside Longos,' 'fuck [racial slur],' 'F Insane,'[3] and 'F 20.' Taylor knew that Eastside Longos, the 20's, and Insane were all gangs. He understood them to be making gang threats. Taylor was wearing his school uniform, which included a burgundy colored shirt. Norman wore red and blue sweat pants, a black long-sleeved shirt, and a red and white baseball cap with 'Big Baby' on it.[4]

"Taylor and the Cox brothers continued to walk, but they could not continue down Anaheim because their path was blocked by the construction site gates—so they turned left onto Gundry. As they did so, the Hispanic males ran across the street toward them, calling out gang names, 'F [racial slur]' and 'Eastside

record in case number B300650. We previously granted petitioner's request for judicial notice of certain portions of the record in case number B211559.

[3]     "Detective Malcolm Evans of the City of Long Beach Police Department testified that 'Baby Insane is a clique of the Insane Crips criminal street gang.' The gang is reputed to be violent.

[4]     "Members of Baby Insane typically have 'BIG,' 'BABY,' or 'B' on their red hats.

Longos.' There appeared to be five males in all. The Hispanic males asked where they were from, which Taylor understood as asking for their gang affiliation.[5] Neither Taylor nor the Cox brothers responded. In the meantime, the Hispanic males surrounded them as they tried to back away. One of the Hispanic males approached them, while making a gang threat; another reached for something from his back, near his hip. Norman pushed Taylor and Michael back and faced the Hispanic males, who surrounded him.

"One of the Hispanic males ran up to Norman and 'socked him in the head.' Norman tried to escape, but slipped and fell. While Norman was on the ground, the Hispanic males repeatedly kicked and punched Norman all over his body. Norman curled up and tried to fend off the blows. Taylor was too afraid to help his cousin. When another of the male Hispanics approached, Taylor and Michael said they 'did not bang,' and they were left alone. Taylor heard Norman say, 'Please don't stab me.' There were four Hispanic males around Norman at the time. Although Taylor did not see any of the attackers holding a weapon, he saw one of them making stabbing motions at the time Norman cried out. Norman did not fight back; he was not armed. The Hispanic males ran away when Taylor yelled and ran toward them.

"Taylor saw Norman was bleeding from his mouth, so he ran to the park where a dance was going on and asked for help. The paramedics and police arrived approximately 15 minutes later. Norman had suffered eight stab wounds, including a fatal

---

[5] "Detective Evans testified that the question 'where are you from' can mean a challenge to identify one's gang affiliation or a challenge to fight.

wound to the left side of his chest that penetrated the lung. Other wounds appeared to be defensive in nature. The stabbing instrument that was used had one blunt edge and one sharp edge. It could not be determined whether there were multiple instruments used. At trial, Taylor identified Gonzalez and Gerson as attackers. From a photographic six-pack lineup, Taylor identified Gonzalez as the one who stomped on Norman and punched his ribs. At the preliminary hearing, Taylor identified Gonzalez, along with Spencer and Gerson. He was not sure about his identification of [petitioner].

"Seleta Castillo lived on Hoffman Avenue, a block away from Gundry. That night, she was walking home from work along Gundry. At the intersection of Gundry and Anaheim, she saw four or five male Hispanics . . . and two female Hispanics across the street. . . . As Castillo walked home, she saw some African-American males walking down Anaheim. Defendants called out their gang affiliation and told the African-Americans they were not supposed to be there—it was not their 'turf.' They repeatedly demanded to know what the African-Americans were doing in their neighborhood. Gonzalez called out, '[racial slur].' The African-Americans did not respond.

"Defendants approached the African-Americans, who were turning down Gundry. Norman said, 'I don't want no problems' and put his hands up. There was nothing in his hands. Defendants surrounded him and passed a weapon amongst themselves. Defendants began to strike and kick Norman. They continued to beat Norman after he had fallen to the ground. Afterwards, they ran away to Hoffman Avenue. . . .

"[¶] . . . [¶]

"[Eva] Ramirez saw the stabbing incident.  That morning, she [and others] visited Spencer.  Toward the end of the day, Gomez and Gonzalez joined them.  It was dark outside when they all left together to go to the nearby park.  They walked back on Gundry.  A young female Ramirez did not know came up and spoke with [petitioner].  A young male named Marcos joined them too; Gerson was not present.  Three African-Americans were walking across the street from them.  She heard them say something.  At some point, she heard someone twice yell, 'This is Insane Crips,' which she understood as a gang challenge.  She looked over and saw an African-American male wearing a red hat, which she believed was a gang color.  Gonzalez, [petitioner], Spencer, and Marcos ran across the street to confront the African-Americans.  She heard one of them swear at the African-Americans; she also heard one of them say Eastside Longos.  Gonzalez, [petitioner], and Spencer fought one of the African-Americans.  Ramirez did not see them use any weapon.  Marcos did not take part; he was standing with the two African-Americans who were not fighting.  Gonzalez, [petitioner], and Spencer ran back across the street, leaving the victim on the ground, before running back to the apartment complex on Hoffman.

"[¶] . . . [¶]

". . . Detective [Malcolm] Evans interviewed Spencer on the day of his arrest.  After advising Spencer of his *Miranda* rights,[6] Spencer waived those rights and agreed to speak to the detective.  Initially, Spencer denied any knowledge of Norman's stabbing.  The audiotape of the interview was played to the jury, subject to

---

[6]     "*Miranda v. Arizona* (1966) 384 U.S. 436.

the instruction that the evidence was admissible solely against Spencer. In his statement, Spencer admitted stabbing the victim, but explained that he did it in self-defense. . . .

"Officer Miguel Rosales testified that Gonzalez had admitted being a member of a 'tag banger crew' called 'NKS,' or 'Nip Killing Squad.' His gang moniker was 'C-Note.' Officer Rosales understood that Gonzalez had subsequently been 'jumped into' the Eastside Longos, which was a full-fledged criminal street gang. [Petitioner] had admitted to membership in the Eastside Longos. Both Spencer and Gerson had admitted being members of the Eastside Longos. The stabbing scene was inside Eastside Longos territory. Baby Insane, a violent clique of the Insane Crip gang, claim all of Long Beach as their territory and are enemies of the Eastside Longos. The hat worn by Norman is consistent with Baby Insane membership.[7]

"[¶] . . . [¶]

"After listening to a hypothetical set of facts consistent with the prosecution case, Detective [Hector] Gutierrez opined that Norman's stabbing would have been committed to benefit the Eastside Longos. The Eastside Longos 'have problems with African-Americans.' The Eastside Longos often commit violent crimes, and their reputation within the gang is enhanced by doing so. Further, commission of violent offenses serves as a warning to rivals and to community members. The former will be less likely to attack Eastside Longos and the latter will be less

---

[7] "Detective Carlos Grimaldo testified that [petitioner] admitted Eastside Longo membership, as did Spencer. If a person yells out, 'This is Baby Insane' in the streets, it is likely to be meant as a gang challenge.

likely to report Eastside Longos for committing crimes. Within the gang's culture, it is understood that those who 'snitch' against gang members will suffer violent retribution. Civilians, as well as gang members, understand this. As a result, many witnesses are afraid to testify against gang members, which inures to the benefit of the gang, allowing its members to commit crimes with impunity.

"If an African-American male wearing a red cap with 'Big Baby' on it yelled out 'This is Baby Insane,' it would be understood as a gang challenge from a gang with a reputation for violence." (*People v. Gonzalez et al., supra*, B211559.)

## III.   PROCEDURAL BACKGROUND

The trial court instructed the jury on (1) direct aiding and abetting[8]; and (2) the natural and probable consequences doctrine[9].

---

[8]     The court instructed the jury with CALJIC No. 3.01, which provided, in relevant part, that:

"A person aids and abets the commission of a crime when he or she:

"[1.]   With knowledge of the unlawful purpose of the perpetrator, and

"[2.]   With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and

"[3.]   By act or advice aids, promotes, encourages or instigates the commission of the crime . . . ."

[9]     The court instructed the jury with CALJIC No. 3.02, which provided, in relevant part, that:

During closing argument, the prosecutor argued that petitioner was guilty of first degree murder. She urged the jury to find that although only Spencer was the actual stabber, petitioner and his codefendants were "[n]ot only . . . . guilty of assault or the beating of [Norman], they are guilty of whatever happens afterwards if it was the natural and probable consequence. Clearly, it is a natural [and] probable consequence, if you have four people all from the same gang all running across the street passing around a weapon, kicking, beating this guy knowing he is outnumbered. It is a clear and probable

---

"One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted.

"In order to find the defendant guilty of the crime of murder you must be satisfied beyond a reasonable doubt that:

"1.     The crime of assault was committed;

"2.     That the defendant aided and abetted that crime;

"3.     That a co-principal in that crime committed the crime of assault; and

"4.     The crime of murder was a natural and probable consequence of the commission of the crime of assault.

In determining whether a consequence is 'natural and probable' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen."

9

consequence that someone is going to stab him.  Someone is going to try to kill him."

As discussed above, the jury found petitioner guilty of first degree murder.

On May 16, 2022, petitioner filed the instant petition for writ of habeas corpus, arguing that because the record did not show whether the jury relied on a direct aider and abettor or natural and probable consequences theory of liability, he was entitled to have his first degree murder conviction reversed under *Chiu, supra*, 59 Cal.4th 155.[10]

On January 20, 2023, we denied the petition, finding that petitioner had failed to establish that the trial court's instruction on the natural and probable consequences doctrine was not harmless error.

On May 31, 2023, the California Supreme Court transferred the cause to us with directions to vacate the January 20, 2023, order denying the petition for writ of habeas corpus and reconsider the petition in light of *In re Lopez* (2023) 14 Cal.5th 562 (*Lopez*).

We vacated our January 20, 2023, order, and following supplemental briefing from the parties, again denied the petition on July 20, 2023.

On September 27, 2023, our Supreme Court granted review and transferred the matter back to this court with directions to issue an order to show cause why the relief requested in the petition should not be granted.  We issued an order to show cause on October 4, 2023, and now grant the petition.

---

[10]    Petitioner filed an earlier petition for habeas corpus raising *Chiu* error in the superior court on August 25, 2021.

# IV.  DISCUSSION

## A.  *Timeliness*

Before we consider the merits of the petition, we address the Attorney General's contention that the petition should be denied as untimely.  Habeas petitions must be filed without "'substantial delay.'"  (*In re Robbins* (1998) 18 Cal.4th 770, 779.)  "Substantial delay is measured from the time the petitioner or his or her counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim."  (*Id.* at p. 780.)  Courts will consider the claim on its merits despite a substantial delay if there is a showing of good cause.  (*In re Reno* (2012) 55 Cal.4th 428, 460.)

Here, petitioner first filed a petition asserting an error pursuant to *Chiu, supra*, 59 Cal.4th 155, on August 25, 2021, that is, seven years after the Supreme Court issued its opinion in *Chiu*.  At the time the opinion in *Chiu* was filed, petitioner was incarcerated and without legal counsel.

Petitioner remained unrepresented by counsel until February 19, 2019, when the trial court, in connection with petitioner's motion for resentencing under section 1172.6, appointed counsel for him.  On July 5, 2019, the court summarily denied the section 1172.6 motion.  Appointed counsel pursued petitioner's motion on appeal.  And, on November 30, 2020, we reversed the court's summary denial and remanded the matter to the trial court for further proceedings.  (*People v. Gonzalez et al., supra*, B300650.)  The remittitur issued in February 2021, and seven months later, petitioner filed a petition for habeas corpus alleging that his conviction must be reversed under *Chiu*.

11

Based on the procedural history of this case, we decline to hold that petitioner forfeited his petition on the grounds that he engaged in substantial delay. (See *In re Mitchell* (1968) 68 Cal.2d 258, 263 ["sufficient justification for petitioner's delay in seeking collateral relief is to be found in his ignorance of law and legal procedures"]; *In re Spears* (1984) 157 Cal.App.3d 1203, 1208 ["petitioner has adequately explained this delay as attributable to his lack of capacity to represent himself [citation] and the scarcity of channels through which legal assistance is available to indigent prisoners"].)

B.    *Instructional Error Not Harmless*

In *Chiu, supra*, 59 Cal.4th 155, the California Supreme Court concluded that a first degree premeditated and deliberate murder conviction for an aider and abettor cannot be based on the natural and probable consequences doctrine as a matter of law. (*Id.* at p. 167.) "First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation, which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.] . . . [T]he connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine . . . ." (*Id.* at p. 166.)

12

For a defendant to be guilty of murder as a direct aider and abettor, "the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. [Citation.] . . . An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Chiu, supra*, 59 Cal.4th at p. 167.)

Where "a jury is instructed on alternate theories of liability, one legally valid and one legally invalid, a federal constitutional error has occurred. The defendant has been deprived of his or her right to 'a jury properly instructed in the relevant law.' [Citations.] The error therefore requires reversal unless we determine the error was harmless beyond a reasonable doubt. [Citations.]" (*Lopez, supra*, 14 Cal.5th at p. 580.)

In determining harmlessness, "[a] reviewing court must determine whether any rational jury would have found the defendant guilty based on a valid theory if the jury had been properly instructed. 'The reviewing court examines what the jury necessarily did find and asks whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well.' [Citation.] In other words, if "'[n]o reasonable jury that made all of these findings could have failed to find'" the facts necessary to support a valid theory, the alternative-theory error was harmless. [Citation.]" (*Lopez, supra*, 14 Cal.5th at pp. 584–585.)

13

The Attorney General does not dispute that the trial court instructed the jury on a legally invalid theory, but contends the instructional error was harmless. According to the Attorney General, the jury's true finding on the gang enhancement demonstrates that it necessarily found petitioner shared with Spencer an intent to kill. At the time of petitioner's trial in 2008, section 186.22, subdivision (b)(1) provided for additional punishment for any "person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." Application of the enhancement did not require that "'the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 66.) Moreover, the court instructed the jury that: "The essential elements of this allegation are: 1. The crime charged was committed for the benefit of, at the direction of, or in association with a criminal street gang; and 2. This crime was committed with the specific intent to promote, further, or assist in any criminal conduct by gang members." Thus, the jury's true finding did not necessarily indicate that the jury also found petitioner knowingly and intentionally aided and abetted the commission of the murder or that he acted with premeditation and deliberation.

The Attorney General also contends that there was no evidence that "the non-stabbers, including petitioner, harbored a mental state that was different or less than Spencer's . . . ." He argues that the evidence petitioner acted with deliberation and premeditation was overwhelming: he engaged in a coordinated attack with his codefendants, all the codefendants knew that a

14

weapon was present, and all the codefendants acted with a motive to commit murder to promote their gang.

We agree with the Attorney General that a reasonable jury, based on this evidence, *could* have found petitioner guilty of first degree murder as a direct aider and abettor. But that is not the question before us. Instead, we must determine whether, based on the evidence at trial, it would have been impossible for a reasonable jury to find petitioner guilty of first degree murder without also finding that he committed the murder as a direct aider and abettor. (*Lopez, supra*, 14 Cal.5th at p. 568.)

There was no evidence any of the defendants knew Norman or that they had discussed a plan for the confrontation. And, although the defendants acted as a coordinated group in surrounding and beating Norman, such coordination supports a finding that all the defendants intended to assault Norman, but not necessarily that they intended to kill him. (See *People v. Underwood* (2024) 99 Cal.App.5th 303, 315–316.) As to the evidence that some of the defendants passed around a knife shortly before the beating, even if a reasonable jury could therefore conclude that petitioner knew about the knife immediately before the stabbing, such a conclusion does not require a further finding that petitioner intended to aid and abet Spencer in using the knife to kill Norman. Indeed, there was no evidence that petitioner encouraged Spencer to stab Norman during the assault. Nor does the evidence that was presented at trial require a finding that petitioner acted with premeditation and deliberation. Here, Spencer stabbed Norman suddenly while the other defendants were in the midst of the beating, and the defendants ran off quickly thereafter. The Attorney General

therefore has failed to meet his burden of showing that the error was harmless. (*Lopez, supra*, 14 Cal.5th at pp. 584–585.)

## V.    DISPOSITION

The petition for writ of habeas corpus is granted. The first degree murder conviction is vacated, and the matter is remanded to the trial court to permit the People to either retry petitioner on a first degree murder charge or accept a reduction of the conviction to second degree murder.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

MOOR, Acting P. J.

LEE, J.*

---

*    Judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.